RIPPLE, Circuit Judge.
 

 Appellant Melinda B. Resser and her husband Alan M. Resser filed a joint federal income tax return for taxable year 1982. The United States Tax Court decided that Mr. and Mrs. Resser were liable for income tax deficiencies due to a substantial under
 
 *1532
 
 statement of tax on their 1982 tax return. After conducting a separate trial on the reserved issue of Mrs. Resser’s qualification for “innocent spouse” relief, the Tax Court decided that Mrs. Resser did not meet the statutory requirements of 26 U.S.C. § 6013(e) and therefore was not entitled to that relief from the joint tax liability. Mrs. Resser now appeals the denial of “innocent spouse” status. For the reasons that follow, we reverse the judgment of the Tax Court and remand for further proceedings.
 

 I
 

 BACKGROUND
 

 A.
 
 Facts
 

 In 1963, Alan Resser earned a bachelor of science degree in finance, married Melinda (the appellant), and began working for a brokerage house. After taking positions as a computer programmer for the Midwest Stock Exchange and as a stockbroker, in 1970 Mr. Resser turned to selling futures on securities for Merrill Lynch and Company. In 1973, with borrowed money, Mr. Resser bought a seat on the Chicago Board Options Exchange (CBOE), a newly registered national securities exchange.
 
 [1]
 
 From then through 1982, the taxable year at issue, he held market maker status in appointed stock options that he traded at the CBOE. In 1974 the Ressers purchased a home in Highland Park, Illinois, in which they and their two children resided during taxable year 1982. They lived a comfortable, perhaps affluent, lifestyle, with cleaning help, frequent nice vacations, season tickets to the opera, and summer camps for the children. In addition, Mr. Resser owned several expensive automobiles.
 

 Mrs. Resser earned a bachelor of science degree in English and a master’s degree in medical communications. She worked as a medical writer until 1969. Although she stopped working at that time to raise the couple’s two children, she did work at home as a market researcher in the early 1970s. In 1978, Mrs. Resser volunteered at Highland Park Hospital; the next year she received a position there as a part-time consultant, and in 1980 she began to work full-time there. At the end of 1983, she took a position as a marketing director for a health care company.
 

 However, the marriage was not harmonious. One element adding strain to their marriage was Mr. Resser’s manic-depressive illness, known as bipolar depression, which manifested itself around 1970 and continued, episodically, throughout their marriage. In early 1980, when the illness returned, Mr. Resser exhibited erratic behavior. He first left his wife and started divorce proceedings, and then withdrew the divorce papers and returned home. The partners in Mr. Res-ser’s trading business asked him to stop trading. They notified Mrs. Resser that her husband’s performance at work was inadequate and that they were forced to terminate their partnership with him. At that time, Mrs. Resser began to work full-time at the hospital. During 1982, she earned $14,655. In 1982 the Ressers also borrowed $250,000 for use in Mr. Resser’s continued trading activity; they used their home as collateral. In October 1988, during another period of manic depression, Mr. Resser left Mrs. Res-ser once again and withdrew all of the cash from their savings account. At the time of the tax trials, Mr. and Mrs. Resser maintained separate residences;
 
 [2]
 
 Mr. Resser was unemployed, due to health complications,
 
 [3]
 
 and was receiving monthly disability insurance.
 

 Mrs. Resser did not participate in the management of day-to-day operations of Mr.
 
 *1533
 
 Resser’s business. She paid the household expenses until 1980; however, at that time, apparently at the suggestion of his psychiatrist, Mr. Resser took over control of the family finances when he recovered from his depression. Mrs. Resser had signature authority on some of their bank accounts, but knew nothing of his trading accounts. The tax returns were prepared each year by an accountant. Mrs. Resser’s involvement with the preparation of the joint returns consisted of gathering income reporting forms and any other relevant tax information delivered to the house and presenting it to the accountant. When the return was completed, Mrs. Resser signed it without reviewing it.
 

 B.
 
 Procedural History
 

 [4]
 

 During the 1982 tax year, Mr. Resser, as a member of the CBOE, made stock option trades in two accounts, AMR and QRF. Only account QRF transactions were at issue in
 
 Resser I,
 
 the previous decision on the Ressers’ tax liability.
 
 [5]
 
 In April 1988, the Commissioner of Internal Revenue sent the Ressers a notice of deficiency claiming a $391,113 deficiency in their joint federal income tax liability for 1982, plus a $97,778 addition to tax for the substantial understatement of tax liability, and an increased rate of interest on the underpayment. In
 
 Resser I,
 
 the Tax Court found that the stock option spread losses used in the QRF transactions were not deductible under section 165 of the Tax Code because Mr. Resser “failed to prove that he entered into the transactions at issue primarily for profit.”
 
 Resser I,
 
 62 T.C.M. (CCH) 617, 627. It decided that the Ressers were jointly liable for the deficient taxes and interest charged by the Commissioner.
 
 [6]
 

 Id.
 
 at 628-29.
 

 Then the Tax Court conducted a second trial to determine whether Mrs. Resser qualified for relief from that liability because she was an innocent spouse. The court attributed the existence of the substantial understatement
 
 [7]
 
 to Mr. Resser and found that Mrs. Resser did not know of the transactions producing the understatement.
 

 Mr. Resser testified that he discussed his trading practices and methods of deferring taxes with petitioner and therefore petitioner was aware of the transactions which resulted in the losses at issue in Resser I. The record indicates, however, that petitioner did not participate in the management or day-to-day operations of Mr. Res-ser’s business. Based on this record, we conclude that petitioner did not know of the transactions producing the understatement.
 

 Resser II,
 
 67 T.C.M. (CCH) 3025, 3025-3. Nevertheless, the Tax Court believed that she had reason to know of the understatement because the figures reported on the 1982 joint return — wage income and income interest of approximately $300,000, but taxable income of only $3,526, for which no tax was owed — should have alerted Mrs. Resser to the fact that there was an understatement of tax. The court pointed out that Mrs. Resser was responsible for gathering the income statements and other tax forms, and thus she should have been aware of the amounts reported on them and should have known that the reported taxable income
 
 *1534
 
 would not support their life-style. The court also noted that Mrs. Resser was an intelligent, mature, well-educated woman who had written the family checks and was cognizant of the amount of income necessary to support the household. The Tax Court concluded that “a reasonably prudent person, with petitioner’s knowledge of the family finances, would have reason to know of the understatement.” 67 T.C.M. at 3026.
 

 The court further found that Mrs. Resser failed to inquire about the understatement once she had reason to know of it. It noted Mrs. Resser’s testimony that she preferred not to know what Mr. Resser did on a daily basis because his business was so volatile, and that she did not review the returns because they did not mean anything to her. It was significant to the court that she chose not to review the tax returns and did not claim that they were concealed from her. When she signed the return each year, the court commented, she should have realized her responsibility for reviewing it. Because “Section 6013(e) is designed to protect the innocent, not the intentionally ignorant,”
 
 id.,
 
 the court concluded that Mrs. Resser’s failure to inquire was not reasonable.
 

 It also determined that it would not be inequitable to hold Mrs. Resser liable for the deficiency attributable to the substantial understatement. 67 T.C.M. at 3027. After noting the Ressers’ expensive lifestyle and Mr. Resser’s estimate that their living expenses were $21,000 each month in 1982, the court decided that Mrs. Resser significantly benefited from the understatement and had not met her burden of proving otherwise by providing specific facts regarding their lifestyle expenditures. It also pointed out that, even though Mr. Resser was responsible for the trading that created the understated income, “the loss was claimed on their joint return and the decreased tax liability allowed more funds to be available for the household.” 67 T.C.M. at 3026. Because she benefited from those funds, the court concluded that it was not inequitable to hold Mrs. Resser liable for the deficiency. The Tax Court then decided that Mrs. Resser was not entitled to relief as an innocent spouse.
 

 II
 

 DISCUSSION
 

 The Internal Revenue Code provides that a husband and wife who file a joint tax return are liable, jointly and severally, for the taxes due on their combined incomes. 26 U.S.C. § 6013(d)(3). “This is so ‘regardless of the source of the income or of the fact that one spouse may be far less informed about the contents of the return than the other.’ ”
 
 Bliss v. Comm’r,
 
 59 F.3d 374, 377 (2d Cir.1995) (quoting
 
 Sonnenbom v. Comm’r,
 
 57 T.C. 373, 381, 1971 WL 2600 (1971)). However, the “innocent spouse” provision was enacted to remedy “grave injustice.”
 
 Bliss,
 
 59 F.3d at 378 (quoting
 
 Hayman v. Comm’r,
 
 992 F.2d 1256, 1259 (2d Cir.1993)). It is therefore construed and applied liberally in favor of the person claiming its benefits.
 
 Friedman v. Comm’r,
 
 53 F.3d 523, 528-29 (2d Cir.1995). An “innocent spouse” may be relieved of liability if he or she proves all four requirements of the defense embodied in section 6013(e)(1):
 

 § 6013(e) Spouse relieved of liability in certain cases.—
 

 (1) In general. — Under regulations prescribed by the Secretary, if—
 

 (A) a joint return has been made under this section for a taxable year,
 

 (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,
 

 (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and
 

 (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,
 

 then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability
 
 *1535
 
 is attributable to such substantial understatement.
 

 26 U.S.C. § 6013(e).
 
 [8]
 

 We review the Tax Court’s decision in the same manner and to the same extent as we review district court decisions from the bench in civil actions.
 
 Applegate v. Comm’r,
 
 980 F.2d 1125, 1128 (7th Cir.1992). The Tax Court’s conclusions of law are subject to de novo review, and its findings of fact are overturned only if there is clear error.
 
 Id,.; see Williams v. Comm’r,
 
 1 F.3d 502, 505 (7th Cir.1993) (stating that Tax Court decisions on questions of fact and mixed questions of fact and law are reviewed under the clear error standard). In this case, there is no dispute that a joint return was filed with a significant tax understatement attributable to Mr. Resser’s activities.
 
 See
 
 26 U.S.C. §§ 6013(e)(1)(A), (B). Nevertheless the Tax Court found that Mrs. Resser remained liable because she failed to make the proper showing under the criteria of parts (C) and (D) of § 6013.
 

 A.
 
 26 U.S.C. § 6013(e)(1)(C)
 

 1. Reason To Know
 

 The third criterion requires the petitioner claiming innocent spouse status to prove she neither knew nor had reason to know of the substantial understatement of tax liability. The Tax Court agreed with Mrs. Resser that she did not actually know of the transactions involved. However, it determined that she failed in her burden of proving that she had no reason to know of the understatement attributable to the transactions.
 

 In cases in which there has been an omission of taxable income from the return, the longstanding test for what constitutes “knowledge” has been stated by this circuit: “The knowledge contemplated by the statute is not knowledge of the tax consequences of a transaction but rather knowledge of the transaction itself.”
 
 Quinn v. Comm’r,
 
 524 F.2d 617, 626 (7th Cir.1975) (concluding that taxpayer had knowledge of the omitted tax item). Although this circuit has not had occasion to confront the matter directly, other circuits have pointed out the difficulty in applying this test in roté fashion in cases such as this one which involve deductions. Writing for the Court of Appeals for the Ninth Circuit in
 
 Price v. Comm’r,
 
 887 F.2d 959 (9th Cir.1989), Judge O’Scannlain noted the difficulty inherent in imposing the test used in omission cases to deduction cases:
 

 [I]f knowledge of the transaction, operating of itself, were to bar relief, a spouse would be extremely hard-pressed ever to be able to satisfy the lack of actual and constructive knowledge element of section 6013(e)(1) in a deduction case.
 

 Id.
 
 at 963 n. 9. In
 
 Friedman,
 
 Judge Cardamone of the Second Circuit expressed the same view:
 

 [AJpplying the omission of income test to cases involving the disallowance of deductions would eviscerate the innocent spouse defense, since merely looking at the return informs the spouse of the transaction— such as a tax shelter—that gave rise to the deduction.
 

 Friedman,
 
 53 F.3d at 530;
 
 see Hayman,
 
 992 F.2d at 1261;
 
 Erdahl v. Comm’r,
 
 930 F.2d 585, 589 (8th Cir.1991); see
 
 also Park v. Comm’r,
 
 25 F.3d 1289, 1298, 1299 n. 3 (5th Cir.) (commenting that the general standard of inquiry stated in
 
 Sanders v. United States,
 
 509 F.2d 162, 167 (5th Cir.1975), was used in both
 
 Price
 
 and
 
 Bokum;
 
 declining to decide whether the two cases espouse different approaches), cer
 
 t. denied,
 
 — U.S. -, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994);
 
 Kistner v. Comm’r,
 
 18 F.3d 1521, 1527 (11th Cir.1994) (announcing decision consistent with
 
 Erdahl
 
 and Price).
 
 But see Bokum v. Comm’r, 94
 
 T.C. 126, 148-51, 1990 WL 17262 (1990) (holding that knowledge of underlying transaction is all that is required both in omission and deduction cases),
 
 affd on other grounds,
 
 992 F.2d 1132 (11th Cir.1993).
 

 In
 
 Price,
 
 Judge O’Scannlain stated succinctly the task before us in deduction cases:
 

 The plain meaning of the section is clear. It requires a spouse seeking relief to es
 
 *1536
 
 tablish that she did not know and did not have reason to know that the deduction would give rise to a substantial understatement.
 

 887 F.2d at 963.
 
 [9]
 
 When evaluating whether the taxpayer had reason to know, the circuits agree that a court must follow an objective “reasonable taxpayer” standard: A spouse has “reason to know” if a reasonably prudent person, under the circumstances of the taxpayer claiming innocent spouse relief, could be expected to know, at the time of signing the return, that the tax return contained a substantial understatement or that further investigation was warranted.
 
 Bliss,
 
 59 F.3d at 378;
 
 Kistner,
 
 18 F.3d at 1525;
 
 Hayman,
 
 992 F.2d at 1261;
 
 Price,
 
 887 F.2d at 965;
 
 Stevens v. Comm’r,
 
 872 F.2d 1499, 1505 (11th Cir.1989);
 
 Shea v. Comm’r,
 
 780 F.2d 561, 565 (6th Cir.1986);
 
 Sanders,
 
 509 F.2d at 166-67. The standard is not abstract, however, for we must place the reasonably prudent taxpayer in the particular circumstances of this taxpayer.
 
 Pietromonaco v. Comm’r,
 
 3 F.3d 1342, 1345 (9th Cir.1993). “[T]he more a spouse knows about a transaction,
 
 ceteris paribus,
 
 the more likely it is that she will know or have reason to know that the deduction arising from that transaction may not be valid.”
 
 Price,
 
 887 F.2d at 963 n. 9;
 
 see also Bliss,
 
 59 F.3d at 378.
 

 Hence, the court’s analysis must focus on whether the spouse had sufficient knowledge of the facts underlying the claimed deductions such that a reasonably prudent person in the taxpayer’s position would question seriously whether the deductions were phony.
 

 Stevens,
 
 872 F.2d at 1505. If the spouse had reason to know, she then had a duty to inquire further.
 
 Id.
 

 In both omission and deduction cases, the factors considered relevant when determining whether a petitioner had reason to know include the spouse’s level of education; the spouse’s involvement in the financial and business activities of the family; any substantial unexplained increase in the family’s standard of living; and the culpable spouse’s evasiveness and deceit about the family’s finances.
 
 Kistner,
 
 18 F.3d at 1525;
 
 Hayman,
 
 992 F.2d at 1261;
 
 Price,
 
 887 F.2d at 965. The Tax Court is to make the determination by considering the interplay or balance of the factors rather than by counting the number of factors in the spouse’s favor.
 
 Bliss,
 
 59 F.3d at 378;
 
 Guth v. Comm’r,
 
 897 F.2d 441, 444 (9th Cir.1990);
 
 Sanders,
 
 509 F.2d at 166-67.
 

 Having presented the parameters of our review, we now turn to the Tax Court’s treatment of the relevant factors in the section 6013(e)(1)(C) analysis.
 

 a.
 

 The Tax Court describes Mrs. Resser as intelligent, mature and well educated, experienced as the family check writer and knowledgeable about the family finances. 67 T.C.M. at 3026. Mrs. Resser admits that she is well educated, but explains that her degrees were unrelated to financial management. She submits that her lack of knowledge in trading options and in tax return preparation led her to rely on the tax accountants who completed their returns and on Mr. Resser, who reviewed the returns for accuracy.
 
 [10]
 
 In family financial affairs, Mrs.
 
 *1537
 
 Resser explains that she merely paid the household expenses, but had no- involvement in Mr. Resser’s trading business or investments. Mrs. Resser also reminds us that her husband had a major attack of depression in 1980, and that, when he recovered, he took over payment of the family expenses.
 

 The Commissioner of Internal Revenue disagrees. The Commissioner asserts that the record supports the Tax Court’s conclusion that the amounts reported were of such a nature that they would have alerted Mrs. Resser to the fact that there was an understatement. “Even a cursory glance would have alerted taxpayer to the strange fact that
 
 no
 
 taxes were due, in the face of reported gross income amounting to more than $340,-000.” Respondent’s Br. at 34.
 

 The Tax Court apparently decided, albeit without discussion, that Mrs. Resser failed to satisfy the “level of education” factor because she was intelligent, mature, and well educated. The record before the court reflects that both Mr. and Mrs. Resser are well educated, but that only Mr. Resser is a professional in the financial world. In
 
 Resser I,
 
 the Tax Court described him as a sophisticated options trader who knew well the favorable tax consequences of his trading losses.
 
 [11]
 
 Mrs. Resser’s education gives her no special understanding of that complex financial world.
 
 [12]
 
 As the Second Circuit commented when it considered the status of a spouse whose husband invested in a transaction designed as an income tax shelter,
 

 we recognize that in the bewildering world of tax shelter deductions, few experts, let alone laypersons, easily discern the difference between a fraudulent scheme and an exceptionally advantageous legal loophole in the tax code.
 

 Friedman,
 
 53 F.3d at 525;
 
 see Foley v. Comm’r,
 
 T.C.Memo. 1995-16, 1995 WL 15090 (granting innocent spouse status to intelligent petitioner “who persevered through very rough times” with alcoholic spouse-stockbroker who claimed tax shelter deduction);
 
 Robertson v. Comm’r,
 
 63 T.C.M. (CCH) 1822, 1826, 1992 WL 3724 (1992) (concluding that petitioner’s liberal arts degrees did not enable her to be familiar with the business and financial concepts needed to question financial decisions). The record will not support a determination that a reasonably prudent taxpayer with Mrs. Resser’s education could be expected to know that the losses claimed in the 1982 tax return, based on highly complex financial transactions, contained a substantial understatement.
 

 b.
 

 The Tax Court then considered the second factor bearing on whether the petitioner had reason to know, “involvement in the financial and business activities of the family”:
 

 While Mr. Resser controlled the family finances during 1982, petitioner was experienced as the family check writer, and she was cognizant of the amount of income necessary to support the household. In fact, petitioner testified that she knew her income during taxable year 1982 was insufficient to support the household.
 

 67 T.C.M. at 3026.
 

 Mrs. Resser did not deny her ability to run the household and to pay the household expenses. She also gave evidence that she was frugal by nature and concerned about finan
 
 *1538
 
 cial security. Nevertheless, the record reveals to us, after an extensive review, a very different and far more comprehensive picture from the one portrayed by the Tax Court. The unrebutted testimony of both Mr. and Mrs. Resser establishes that the husband assumed financial decision-making in the family. In spite of Mrs. Resser’s concerns, they borrowed money so that he could buy a seat on the CBOE in 1973 and moved to Highland Park in 1974. In addition, by 1980, Mr. Resser had taken over the bill-paying. He clearly dominated their financial affairs throughout their marriage.
 
 See Terzian v. Comm’r,
 
 72 T.C. 1164, 1170-71, 1979 WL 3839 (1979) (noting husband’s dominance in family finances; thus, even though the wife was an educated woman, “the fact that she signed the return without reading it does not require the conclusion that she had reason to know of the omitted income”).
 

 It is generally agreed that the “spouse’s role as a homemaker and complete deference to the other spouse’s judgment concerning the couple’s finances, standing alone, are insufficient to establish that a spouse has no ‘reason to know.’”
 
 Kistner,
 
 18 F.3d at 1525;
 
 see also Shea,
 
 780 F.2d at 566. However, the complexity of the financial transactions clearly cannot be ignored, and Mrs. Resser did make a showing that her husband’s financial affairs were very complex.
 
 See Shea,
 
 780 F.2d at 566 (no showing);
 
 Sanders,
 
 509 F.2d at 169-70 (proper showing);
 
 see also Padgett v. Comm’r,
 
 T.C.Memo. 1987-130, 1987 WL 40206 (1987) (innocent spouse status granted to wife whose attorney husband engaged in complex corporate stock transactions, handled the business affairs, gave wife an allowance for household expenditures, and wife signed income tax return without questioning it). In any case, neither Mrs. Resser’s experience as the family check writer nor her knowledge that her income in 1982 ($14,655) would not support their household could have given her reason to know of the understatement in their 1982 tax returns.
 

 The Tax Court gave another reason that Mrs. Resser, as “a person of normal intelligence,” should have known of the understatement:
 

 With respect to the instant case, we believe that the amounts reported on the joint return were of such a nature that they would have alerted petitioner to the fact that there was an understatement of tax. Cf.
 
 Cohen v. Commissioner,
 
 [T.C.Memo. 1987-537, 1987 WL 48831];
 
 Levin v. Commissioner,
 
 [T.C.Memo. 1987-67, 1987 WL 40119]. The 1982 joint tax return reported wage and income and interest income of approximately $300,000 yet taxable income was merely $3,526, and petitioners paid no tax for the year. Although petitioner did not review the returns, she was responsible for gathering Forms W-2 and 1088 and thus should have been aware of the amounts reported thereon. We believe that a person of normal intelligence would know that the negligible taxable income reported on petitioners’ return was insufficient to support their lifestyle. See
 
 Shapiro v. Commissioner,
 
 T.C. Memo 1986-142, 1986 WL 21855.
 

 67 T.C.M. at 3025-3 to 3026.
 

 At oral argument, counsel for the Commissioner reiterated the position that someone with a reported income of $300,000 does not usually escape all tax liability. Judge East-erbrook noted the fallacy in that position by reminding counsel that traders in highly volatile instruments expect to have large realized gains or losses from year to year, and thus to experience some years with large taxes and others with no tax. He pointed out, as well, that it is possible to realize losses, for tax purposes, that have nothing to do with cash flow. In any case, we believe it is clearly erroneous to deny innocent spouse status on the ground that “a person of normal intelligence” should have known, by looking at the amounts reported on the Ressers’ joint return, that the deductions would give rise to a substantial understatement.
 

 Nor can Mrs. Resser’s general awareness of her husband’s options trading and of the loss deductions her husband might claim on their tax forms be the basis for deciding she had constructive knowledge. As the Second Circuit concluded,
 

 [m]ere knowledge that the spouse has invested in a tax shelter resulting in substan
 
 *1539
 
 tial tax savings is accordingly, without more, insufficient to establish constructive knowledge of a substantial understatement of tax.
 

 Friedman,
 
 53 F.3d at 531 (concluding that taxpayer did not have reason to know of understatement: “Her acquaintance with her husband’s business and her actions in collecting tax records relating to household accounts fall far short from establishing that she had the sophisticated financial insight necessary to assess the propriety of a complex international tax shelter.”).
 
 [13]
 
 Mrs. Res-ser did not have reason to know that the deduction resulting from her husband’s stock option trading activities necessarily would produce a substantial understatement; nor did she have the opportunity to discover them easily.
 
 See Price, 887
 
 F.2d at 963;
 
 Shea,
 
 780 F.2d at 566;
 
 Padgett,
 
 T.C.Memo. 1987-130 (noting the complexity of the tax information, and concluding that neither the spouse nor “any reasonable person under her circumstances” could have analyzed the transactions without “a sophistication in tax return preparation which she did not have ... and should not be expected to have”). The petitioner makes a clear showing that her husband’s financial affairs were relatively complex, and therefore that she should not be imputed with knowledge of his accounting methods.
 
 See Sanders,
 
 509 F.2d at 166, 169-70. The record affords no basis for holding Mrs. Resser, although educated, accountable for knowing whether her husband’s “double box” or “butterfly” spreads had led to a substantial understatement. Unlike the taxpayer in
 
 Stevens,
 
 Mrs. Resser took no active part in her husband’s business dealings.
 
 See Stevens,
 
 872 F.2d at 1506. Nor did she participate in any of the transactions in question.
 
 Hayman,
 
 992 F.2d at 1258. In addition, Mrs. Resser had a rational basis for believing that they had no taxable income in 1982. First, she knew that they had borrowed $250,000 that year, because she had signed the mortgage loan agreement. And second, of course, she knew that an accountant was doing the actual tax return preparation. It was reasonable for her to rely on a financial expert (her husband) and a tax expert (their accountant).
 

 The duty to enquire does not extend so far as to impose on a spouse the duty to seek advice from her own independent legal and financial advisers as to the propriety of her spouse’s investments.
 

 Friedman,
 
 53 F.3d at 531 (citing
 
 Pietromonaco,
 
 3 F.3d at 1344 (wife’s reliance, in an omitted income case, on the belief that the return was done by a bookkeeper a factor in according innocent spouse status)).
 

 The record reveals that Mrs. Resser satisfied her burden of proving the first two factors in determining that she ‘“did not know and did not have reason to know that the deduction would give rise to a substantial understatement.’”
 
 Hayman,
 
 992 F.2d at 1261 (citing
 
 Price,
 
 887 F.2d at 963). The Tax Court’s decision to the contrary cannot be supported by the record.
 
 [14]
 

 
 *1540
 
 c.
 

 The third factor relevant to the “reason to know” determination is a substantial unexplained increase in the family’s standard of living. Mrs. Resser testified that their lifestyle in 1982 was not lavish and was no different from the standard seen in prior years; therefore there was no change in their standard of living that would have given her reason to know that there was a substantial understatement.
 

 Like our colleagues in the Eleventh Circuit, we do not consider this factor necessarily to be unimportant in deduction cases; however, we also must remember that lavish lifestyles are not necessarily incompatible with large deductions.
 
 Stevens,
 
 872 F.2d at 1506. Notably, the Tax Court did not consider this third factor when determining that Mrs. Resser had reason to know of the understatement. Its only allusion to this consideration is with respect to the later step of weighing the equities of holding her responsible.
 
 See supra,
 
 at II.B. In that context, it points to the Ressers’ frequent vacations and social activities and to Mr. Resser’s testimony that their living expenses were about $21,000 per month.
 

 The Tax Court’s reluctance to rely on this factor to support a finding that Mrs. Resser ought to have known that the deduction resulted in an understatement of her income is understandable. We believe, however, that the circumstances surrounding that lifestyle ought to have been considered because they are relevant and probative of Mrs. Resser’s contention that there was insufficient change in that lifestyle in the year in question to cause her to attach any significance to this factor when considering the family’s tax situation. The record reflects that vacations and social events had been part of their lifestyle since 1974 or 1975. Also, no documentation or other testimony in the record corroborates Mr. Resser’s unsolicited testimony that the 1982 household expenses amounted to $21,-000 per month. Moreover, neither the record nor the Commissioner suggests that there were unusual expenditures or sudden expensive acquisitions in 1982 that would have given Mrs. Resser reason to know of a change in their financial circumstances.
 

 “[O]ne person’s luxury can be another’s necessity, and the lavishness of an expense must be measured from each family’s relative level of ordinary support.”
 
 Sanders,
 
 509 F.2d at 168. When the evidence reflects that the taxpayers maintained the same standard of living, even if that standard is affluent, and does not show a sudden increase that would qualify as a lavish increase from the level of ordinary expenses, the spouse has satisfied the requirement that she did not have reason to know under the third factor.
 
 See Kistner,
 
 18 F.3d at 1525 (finding that expenditures indicated affluence, not a sudden, lavish increase from level of ordinary expenses);
 
 Pietromonaco,
 
 3 F.3d at 1347 (concluding that spouse had no reason to doubt veracity of the reported income and that she sustained her burden of showing she did not have reason to know that income had been omitted from her tax returns);
 
 Price,
 
 887 F.2d at 965 (finding that expenditures were not unusually lavish when compared to past standard of living and spending patterns);
 
 Sanders,
 
 509 F.2d at 168 (finding that taxpayers’ generally improving standard of living would not have put spouse on notice of omitted income). We conclude that the Tax Court failed to apply the proper test for the third factor: It considered the Ressers’ generally expensive lifestyle rather than a substantial unexplained increase in that lifestyle. This error is clear error.
 

 d.
 

 The final factor in determining whether the petitioner had reason to know is the culpable spouse’s evasiveness. The Tax Court, without discussion, noted that Mr. Resser did not conceal from her the tax returns or, specifically, the tax savings resulting from the QRF losses. 67 T.C.M. at 3026. It further noted that Mrs. Resser “introduced no evidence that she was prevented from ascertaining the facts about any item on the return she signed.”
 
 Id.
 

 
 *1541
 
 We conclude that the Tax Court misapplied the fourth factor. It is clear from the ease law that evasiveness or deceit must be viewed in a broader context—in the totality of the circumstances. We must also remember that this case involves not omissions from a statement of income but the legitimacy of deductions based on one spouse’s business dealings. This factor can encompass a taxpayer’s refusal to be forthright about the couple’s income,
 
 Sanders,
 
 509 F.2d at 167, or a refusal to discuss investments,
 
 Stevens,
 
 872 F.2d at 1507, or a deliberate hiding of the real motivation for founding a church,
 
 Guth,
 
 897 F.2d at 444. Mrs. Resser describes several investments that Mr. Resser allegedly made without her knowledge. Mr. Resser admitted to one such investment.
 
 [15]
 
 Moreover, special circumstances (like emotional problems and complex finances) are clearly permissible considerations.
 
 See Sanders,
 
 509 F.2d at 169.
 

 2. Duty of Inquiry
 

 If a spouse has reason to know of the understatement, the spouse then incurs the duty of inquiry under section 6018(e).
 
 Park,
 
 25 F.3d at 1293;
 
 Price,
 
 887 F.2d at 965-66;
 
 Shea,
 
 780 F.2d at 565.
 

 The test for determining whether the knowledge of the putative innocent spouse was sufficient to trigger a duty to inquire “is the same subjective test used to determine whether she had reason to know of the understatement: would a reasonably prudent taxpayer
 
 in her position
 
 be led to question the legitimacy of the deduction.”
 

 Erdahl,
 
 930 F.2d at 591 (quoting
 
 Guth,
 
 897 F.2d at 445). If a spouse knows “enough facts to put her on notice that ... an understatement exists, ... a duty of inquiry arises which, if not satisfied by the spouse, may result in constructive knowledge of the understatement being imputed to her.”
 
 Price,
 
 887 F.2d at 965. The Tax Court stated that a petitioner cannot turn a blind eye to facts fully disclosed on a tax return that would reasonably have put her on notice that further inquiry would need to be made.
 
 Bokum v. Comm’r,
 
 94 T.C. at 148. According to the court, Mrs. Resser signed the return without asking about the large difference between gross income and taxable income. 67 T.C.M. at 3026.
 

 Despite the fact that Mrs. Resser did not read the 1982 return before signing it, the record will not support a characterization that she buried her head in the sand. She had asked about her husband’s trading methods in the past. Mr. Resser’s own testimony at trial makes clear that Mrs. Resser had expressed concern about tax rolls soon after he had started options trading. After defining a tax roll as “a method of trading where you can make certain types of trades that have favorable tax advantages so that you can defer income from one year to the next,” tr. 210, Mr. Resser stated that it was “an accepted business practice on the floor,” and that, in the early days of his trading, around 1975 perhaps, he had explained the practice to his wife:
 

 I explained to her that the tax rolls or tax-deferred trades was a common practice in the industry, done by members of the New York Stock Exchange, members of the Chicago Board of Trade, and being done on the Options Exchange. There was a method of being able to defer your taxes to the following year so that you wouldn’t have any taxes, or you would have less taxes to pay, in the year we are talking about.
 

 Tr. at 211. He added that his explanation “alleviated her worries” about the tax rolls, tr. 212, and that they did not discuss the taxes every year because she knew “about the tax rolls and the benefit of them” from “back in the earlier times.”
 
 [16]
 
 Tr. at 223. In
 
 *1542
 
 the early days of his trading, therefore, she behaved as a reasonably prudent taxpayer; she questioned the legitimacy of the trading methods he used, and he assured her that the tax roll was a tried and true technique. He continued to use the tax roll as a trading strategy over the years. The Second Circuit has held that such inquiry is sufficient to achieve innocent spouse status:
 

 There is a common sense limit we think to a spouse’s duty of investigation in those circumstances where the more financially sophisticated spouse invokes the support of tax experts and accountants in asserting an improper deduction. The wife claiming status as an innocent spouse under such circumstances must persuade the fact-finder that she had no reason to suspect that what her more financially sophisticated husband did was wrong. In short, an innocent spouse is one who despite having made reasonable efforts to investigate the accuracy of the joint return remains ignorant of its illegitimacy.
 

 Friedman,
 
 53 F.3d at 525.
 
 [17]
 

 In this case, the spouse, years before this tax year at issue, expressed doubts about Mr. Resser’s complex trading method and was told by a successful expert in the field and a man whom she trusted, her husband, that it was valid. Then, in 1982, the tax form contained a similar type of deduction arising from a similar type of transaction. There was nothing inherently obvious on the return that would give a reasonable taxpayer a reason to question it.
 
 See Stevens,
 
 872 F.2d at 1507 (spouse’s duty may be triggered if she perceives something wrong with the tax return or finds the other spouse deceptive). In this case, a reasonably prudent taxpayer under these circumstances would not be expected to know, at the time of signing the 1982 return, that it contained a substantial understatement.
 
 See Guth,
 
 897 F.2d at 444 (no duty of inquiry when petitioning spouse was aware of the existence of her husband’s charitable deductions, but was not aware of anything unusual about them).
 

 Moreover, the tax implications of that trading method were calculated by a professional accountant whom they knew. Mrs. Resser simply provided the W-2 forms and any 1099 forms and signed the completed tax forms when the accountant returned them. A petitioner can satisfy her duty of inquiry by receiving assurances that the return was prepared by a reputable accountant.
 
 Price,
 
 887 F.2d at 966 (finding that wife satisfied duty of inquiry when she questioned her husband and was assured that CPA had prepared the return);
 
 Foley,
 
 T.C.Memo. 1995-16 (concluding that petitioner satisfied duty of inquiry by asking husband about tax shelter deductions, hearing that she should not worry because he invested in tax shelters and because return preparer had signed return).
 

 
 *1543
 
 In sum, therefore, Mrs. Resser satisfied her concerns about the trading methods her husband used, both by the explanations and assurances of her husband and by the professional preparation of the taxes. As the Tax Court put it in
 
 Foley v. Comm’r,
 
 T.C.Memo. 1995-16, a “taxpayer may satisfy the duty to inquire by taking reasonable steps to determine the accuracy of the return, such as by questioning his or her spouse and receiving a plausible explanation.” Because there was nothing on the 1982 tax return that was significantly different
 
 from
 
 those of prior years, and because no facts were present that would have led Mrs. Resser to harbor doubts about the accuracy of their 1982 tax return, we conclude that the record will not support the conclusion that a reasonable person in Mrs. Resser’s circumstances would have been on notice that a substantial understatement existed such that she would have questioned the accuracy of the 1982 tax return.
 
 Erdahl,
 
 930 F.2d at 590 n. 7 (“If a spouse has questioned the underlying transaction ... previously and has received assurances as to its (or their) legitimacy, she need not repeat her queries at the time she is presented with the return, unless the return arrives with red flags flying.”);
 
 Robertson,
 
 63 T.C.M. at 1826 (concluding that nothing in petitioner’s circumstances caused her to harbor doubts);
 
 see also Padgett,
 
 T.C.Memo. 1987-130 (concluding that spouse would not have been on notice of need to inquire by studying return instead of merely signing it; deciding that no reasonable person could have analyzed the transactions).
 

 The Tax Court’s decision that Mrs. Resser had a duty to inquire about the 1982 substantial understatement was clearly erroneous. Our review of the record leads us to the definite and firm conviction that the Tax Court clearly erred in denying Mrs. Resser innocent spouse status under section 6013(e)(1)(C).
 

 B.
 
 26 U.S.C. § 6013(e)(1)(D): Inequity of Liability
 

 The last requirement under section 6013(e) that must be established by a petitioner is that it would be inequitable to hold the innocent spouse liable for the deficiency attributable to the substantial understatement. This determination is made on the basis of all the facts and circumstances. Treas.Reg. § 1.6013-5(b);
 
 see Friedman,
 
 53 F.3d at 532. “Relevant factors include significant benefits received as a result of the understatements of the spouse claiming relief, any participation in the wrongdoing on the part of the ‘innocent’ spouse, and the effect of a subsequent divorce or separation.”
 
 Id.
 

 Although section 6013(e) no longer specifically requires the court to determine whether the spouse “significantly benefited” from the understatement, the factor is still to be taken into account as part of its equity determination.
 
 Hayman,
 
 992 F.2d at 1262;
 
 Estate of Krock v. Comm’r,
 
 93 T.C. 672, 678, 1989 WL 148355 (1989). Normal support, as measured by the taxpayers’ circumstances, is not considered a “significant benefit.”
 
 Sanders,
 
 509 F.2d at 168;
 
 Foley v. Comm’r,
 
 T.C.Memo. 1995-16. However, amounts received by a spouse in excess of normal support do constitute a significant benefit.
 
 Busse v. United States,
 
 542 F.2d 421, 427 (7th Cir.1976).
 

 Mrs. Resser submits that her lifestyle was not lavish and that Mr. Resser abandoned her and her children in 1988, after dissipating over $100,000.
 
 [18]
 
 She asserts that she did not receive a substantial benefit from the understatement and that the Tax Court clearly erred in making that determination. However, the court noted that Mrs. Resser did not suggest that her husband either concealed information about the taxes or placed limits on the amount of money she could spend. It also noted their expensive lifestyle. In conclusory fashion, it remarked that, although Mr. Resser had taken all the cash from the couple’s savings accounts in 1988, there was no evidence that these funds were traceable to the 1982 tax savings. The court, again in summary fashion, noted that it believed that the funds in
 
 *1544
 
 those bank accounts came from Mr. Resser’s income in 1987. On this basis, the court concluded that it was not inequitable to hold Mrs. Resser liable for the deficiency because she received the benefits from the loss when it was claimed.
 

 Mr. Resser’s tax straddles may have allowed both Ressers a tax benefit in every year since he commenced his involvement in the method in 1975. The IRS has not argued, however, that the tax straddles for years before 1982 produced improper deductions that elevated the Ressers’ standard of living in the years prior to 1982. The record will not support, therefore, a conclusion that Mrs. Resser’s standard of living in those years was artificially elevated by improper deductions. Thus, if Mrs. Resser received any “inequitable” benefit through a higher standard of living, it would be from the illegal straddle in 1982 and would be reflected in a change in lifestyle in 1982 or in the following years.
 
 [19]
 

 We turn first to the tax year in question. The record does not support the Tax Court’s conclusion that Mrs. Resser enjoyed the fruits of the understatement during 1982. Neither the court nor the Commissioner refers to evidence in the record indicating that Mrs. Resser received any benefit above normal support. It is true that the family had a relatively high standard of living, but the record does not establish that it was a lifestyle which changed in 1982.
 

 We therefore turn to the years after 1982 to determine whether there is an appreciable increase in the standard of living or other financial benefit that can be traced fairly to the illegal 1982 straddle. The Tax Court expressed the view that the funds taken by Mr. Resser from the couple’s accounts in 1988 were traceable not to the 1982 tax savings, but rather to his 1987 income. Although it gave no reason for that belief, it also identified no other funds that were traceable to the 1982 tax savings. Indeed, the court pointed to no factor in Mrs. Resser’s 1982 economic situation that would support the finding that she did benefit from a tax savings during 1982. The record contains evidence that, from that point on, Mrs. Resser was working full-time and her marriage was deteriorating.
 
 See Purificato v. Comm’r,
 
 9 F.3d 290, 296 (3d Cir.1993) (commenting that, “if the spouse did not specifically benefit, was subsequently deserted, divorced, or separated, and would have to pay the tax and additions from his or her own assets, equity may weigh in favor of relief’),
 
 cert. denied,
 
 — U.S. -, 114 S.Ct. 1398, 128 L.Ed.2d 71 (1994). There is no evidence that she experienced, during these ensuing years, a more prosperous lifestyle attributable to the 1982 understatement.
 

 We now turn to the other factors that are relevant to the inquiry of whether it would be inequitable to hold Mrs. Resser liable for the deficiency.
 
 See Friedman,
 
 53 F.3d at 532. We already have noted, in the earlier sections of this opinion, that Mrs. Resser was not a knowing party to the illegal deduction. As we also have noted, the record makes clear that, given the precarious state of the marriage after 1982 and Mrs. Resser’s concomitant need to work full-time, her economic situation, including the prospect of any benefit from the tax straddle in question, certainly did not improve in the following years.
 

 Congress intended that the innocent spouse provision be “construed and applied liberally in favor of the person claiming its benefits.”
 
 Friedman,
 
 53 F.3d at 528-29;
 
 see also Bliss,
 
 59 F.3d at 378;
 
 Padgett,
 
 T.C.Memo. 1987-130 (1987). In our view, when all the facts and circumstances are taken into consideration, Mrs. Resser has established on this record that it would be
 
 *1545
 
 inequitable to hold her Hable for the deficiency-
 

 C.
 
 26 U.S.C. § 6013(e)(1)(B): Grossly Erroneous Items of One Spouse
 

 The Tax Court did not address whether the understatement resulted from a grossly erroneous item. T.C.M. at 8025-3. A grossly erroneous item is defined as
 

 (A) any item of gross income attributable to such spouse which is omitted from gross income, and
 

 (B) any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law.
 

 26 U.S.C. § 6018(e)(2). Therefore, in order to estabhsh that items of deduction are grossly erroneous, petitioner must show that they had no basis in fact or law.
 
 Flynn v. Comm’r,
 
 93 T.C. 355, 364, 1989 WL 107095 (1989);
 
 Douglas v. Comm’r,
 
 86 T.C. 758, 763, 1986 WL 22118 (1986);
 
 Purcell v. Comm’r,
 
 86 T.C. 228, 240, 1986 WL 22087 (1986),
 
 aff'd,
 
 826 F.2d 470 (6th Cir.1987),
 
 cert. denied,
 
 485 U.S. 987, 108 S.Ct. 1290, 99 L.Ed.2d 500 (1988).
 

 This issue, although argued to the Tax Court, was not briefed or argued in this court by either party, undoubtedly because the Tax Court specifically did not reach the issue in its decision. The underlying Htigation involving the basic tax HabiHty of both Mr. and Mrs. Resser was never appealed to this court. Under these circumstances, the appropriate course is to remand the case to the Tax Court for further proceedings.
 

 Conclusion
 

 For the foregoing reasons, we reverse the decision of the Tax Court and remand for proceedings consistent with this opinion.
 

 REVERSED AND REMANDED.
 

 [1]
 

 .Mrs. Resser testified that Mr. Resser wanted to buy a seat and become a charter member of the CBOE in 1973. Because he had been suffering depression and had been unemployed, he secured a $30,000 mortgage loan to accomplish his plan. Mrs. Resser, opposed to the mortgage and to her husband’s desire to become a trader, but also frightened because of his illness and the prospect of a failing marriage, reluctantly agreed to the mortgage.
 

 [2]
 

 . The Ressers’ marital dissolution and property settlement were finalized on February 19, 1993.
 

 [3]
 

 . Mr. Resser testified that he was suffering from arthritis in his back and from "a manic depressive illness that has been giving me problems, especially as of late." He further explained his manic depressive illness: ”[M]ost of the time, I am relatively stable. So when I am stable, it is fine, but I have had a past where it is not always so stable.” Tr. at 224.
 

 [4]
 

 .
 
 Resser I,
 
 the determination of liability, is found at T.C.Memo. 1991-423, 1991 WL 163536 (U.S.Tax Ct.), 62 T.C.M. (CCH) 617, T.C.M. (P-H) 91,423 (1991).
 
 Resser II,
 
 the denial
 
 of “innocent
 
 spouse” status, is found at T.C.Memo. 1994-241, 1994 WL 223238 (U.S.Tax Ct.), 67 T.C.M. (CCH) 3025, T.C.M. (P-H) 94,241 (1994).
 

 [5]
 

 . Account QRF was a joint account registered in the name of Mr. Resser and Rialcor Securities Corporation, the CBOE member firm of which he was a one-third owner and through which he cleared all his trading activity. Mr. Resser received 90 percent of the profits and losses realized in the QRF account. For the taxable year 1982, the Ressers reported a $250,671 loss from stock option investments on Schedule C of their Federal income tax return (Form 1040). The gains and losses in the stock option spread transactions from accounts AMR and QRF are set forth
 
 in Resser I,
 
 62 T.C.M. at 623-24.
 

 [6]
 

 . The Tax Court noted that "the tax benefits of petitioner’s option spreads strategy so far outweighs [sic] the economic profit potential that we cannot accept petitioner’s contention that he was primarily motivated by the desire to earn a profit.”
 
 Resser I,
 
 62 T.C.M. at 628. It then held that the losses from the stock option trading in account QRF were not allowable.
 

 [7]
 

 . Section 6013(e)(3) defines "substantial understatement” as a liability in excess of $500. 26 U.S.C. § 6013(e)(3).
 

 [8]
 

 . Section 6013(e)(1) was amended by the Deficit Reduction Act of 1984, Pub.L. 98-369, sec. 424(a), 98 Stat. 801-802. The amendment applies retroactively to all years to which the Internal Revenue Code of 1954 applies. Therefore the amended version applies to this case.
 

 [9]
 

 . The innocent spouse provision, as first enacted, granted relief only in cases in which the understatement of tax was attributable to omissions from income, and not for erroneous deductions or credits. In 1984 Congress amended the provision to relieve a spouse from joint liability for groundless deductions claims as well. Pub.L. No. 98-369, 98 Stat. 494, 803 (1984). The legislative history reflects the desire of Congress to grant protection when “one spouse claims phony business deductions in order to avoid paying tax and the other spouse has no reason to know that the deductions are phony." H.Rep. No. 98-432, Pt. 2, 98th Cong., 2d Sess. 1502,
 
 reprinted in
 
 1984 U.S.C.C.A.N. 697, 1143.
 
 See Bokum,
 
 992 F.2d at 1134-35;
 
 Guth v. Comm’r,
 
 897 F.2d 441, 444 (9th Cir.1990);
 
 Purcell v. Comm’r,
 
 826 F.2d 470, 474 (6th Cir.1987),
 
 cert. denied,
 
 485 U.S. 987, 108 S.Ct. 1290, 99 L.Ed.2d 500 (1988). The modified innocent spouse provision is able to remedy injustices more broadly by including relief for spouses in both deduction and omission cases.
 

 [10]
 

 . Given that the adjusted gross income was similar in 1982 to what it had been in prior years, Mrs. Resser contends that she acted reasonably in relying on the expertise of professionals. In 1982, the year at issue, the Ressers' AGI amounted to $64,955. Mrs. Resser compared that figure to past years to indicate the consisten
 
 *1537
 
 cy: Their 1981 AGI was $71,987; their 1980 AGI was $52,856; and their 1979 AGI was $54,871.
 

 [11]
 

 . In
 
 Resser I
 
 the Tax Court described Mr. Res-ser in this way:
 

 Petitioner was an experienced, sophisticated trader in option transactions, with the knowledge and background to make his own trading decisions. To execute the loss generating trades, petitioner established and used an account other than the one in which he conducted his primary trading activities. Petitioner was undoubtedly aware of the favorable tax consequences arising from the offset of losses reported on Schedule C, Form 1040, against other income and deferring trading gains to subsequent years.
 

 62 T.C.M. at 627.
 

 [12]
 

 . It is noteworthy that, in
 
 Resser I,
 
 the Tax Court spent much of its opinion explaining Mr. Resser's method of trading, in sections entitled "Fundamentals of CBOE Option Trading,” “Option Trading Involving Spreads,” "Risk and Price Movement,” “CBOE Background,” "The CBOE Market Maker Function," "Effecting CBOE Option Transactions,” "Accounting System,” "Petitioner's Activities,” and "Account QRF Option Spreads.”
 
 See 62
 
 T.C.M. at 618-624.
 

 [13]
 

 . The taxpayer in
 
 Friedman
 
 was a homemaker with less education than Mrs. Resser. However, Mrs. Resser, like the
 
 Friedman
 
 taxpayer, lacked the "sophisticated financial insight” needed to have reason to know of the understatement.
 

 [14]
 

 . It is equally apparent that the Tax Court erroneously relied upon
 
 Cohen v. Comm’r,
 
 T.C.Memo. 1987-537, and
 
 Levin
 
 v.
 
 Comm'r,
 
 T.C.Memo. 1987-67, to support its conclusion that "the amounts reported on the joint return were of such a nature that they would have alerted petitioner to the fact that there was an understatement of tax.” Each case demonstrated that the loss deduction producing the understatement was fully disclosed on the face of the return and reasonably put the spouse on notice that further inquiry needed to be made. In this case, the loss deduction reported on the 1982 return ($250,-671) was similar to the one reported in 1981 ($141,721) and in other years. Nothing about it would have put Mrs. Resser on notice that further inquiry was needed.
 

 Shapiro v. Comm'r,
 
 T.C.Memo. 1986-142, also fails to support the court’s position and falls outside the facts of this case.
 
 Shapiro
 
 concerned unreported income, and the spouse claiming innocent spouse status served as an officer and/or director of the enterprises whose income was not reported, and would have known of the income. Equally inapposite are
 
 Estate of Jackson v. Comm’r,
 
 72 T.C. 356 (1979), and
 
 Hammond v. Comm’r,
 
 T.C.Memo. 1990-22, 1990 WL 1107, cases concerning omitted income. In each case the court found that the spouse knew of her husband’s lavish expenditures, which exceeded the reported income during the year in question. The Tax Court in this case did not point to lavish expenditures and did not base its decision on a sudden increase in the Ressers’ style of living, but rather on the fact that Mrs. Resser knew that
 
 *1540
 
 the household expenditures were much greater than what could be supported on the reported taxable income of $3,526, if the losses claimed actually were real.
 

 [15]
 

 . Mr. Resser testified that he did not discuss a 1987 investment in horses with his wife "[b]e-cause I knew she was very upset about it, and it is something that I felt that I really wanted to do. It was a small investment compared to our total assets, and I frankly had—I guess the word could be visions of potentially really becoming someone important in the horse racing business.” Tr. at 257.
 

 [16]
 

 . In its brief, the Commissioner presented a skewed description of the record:
 

 The evidence in this case leaves no doubt that taxpayer had "reason to know” of the understatement. Mr. Resser testified that he had explained to taxpayer what a “tax roll” was and that he believed that it was a legitimate means of deferring income. Taxpayer disput
 
 *1542
 
 ed this account, asserting that he did not tell her what a "tax roll” was until the notice of deficiency arrived.
 

 Respondent’s Br. at 18-19. Mrs. Resser did indeed state that she never heard the term “tax roll,” but responded that there might have been another term, although she couldn't recall it. Tr. at 180. (She also was unable to recall whether the term "estate planning vehicle" was used when her husband and their attorney set up trusts for the family. Tr. at 123-24.)
 

 It is clear from Mrs. Resser’s testimony that her husband had discussed investments with her, tr. at 121, and that he talked about his trading and about financial matters often enough that she had concerns and a perhaps superficial perception of those matters: She explained that she never really discussed his trading with him because she considered it to be like gambling — and she didn't play cards or go to the races. Tr. at 114. She saw the nature of the trading as risky and felt insecure about it. Tr. at 120. She called his business "fluid” and thought he could not have told her how much money he was making. Tr. at 192. The record is replete with Mrs. Resser's concerns about her husband's trading business; her testimony actually complements her husband’s testimony that he explained his trading practices, and the legitimacy of those methods, to her to alleviate her worries. The evidence also clearly reflects her understanding that he was a good trader who had the respect of his peers, tr. at 115, and that she trusted him and their accountant to handle the tax implications of that trading.
 

 [17]
 

 . Although Richard Kushnir visited frequently the home for business meetings with Mr. Resser, the record does not make clear that Mrs. Resser was aware that Mr. Kushnir engaged in similar transactions. We note that, had Mrs. Resser inquired of her husband’s colleague, he would have informed her that he did engage in such transactions and believed them to be legal. Tr. 41-46, 56-58.
 

 [18]
 

 . The Tax Court refused to consider the final divorce decree and property settlement, which was proffered to the court after trial. Although the documents were appended to the petitioner's brief, we decline to consider them as well.
 

 [19]
 

 . In this regard, the regulation, although cast in terms of an omission deficiency rather than a deduction deficiency, is helpful:
 

 ... However, normal support is not a significant "benefit” for purposes of this determination. Evidence of direct or indirect benefit may consist of transfers of property, including transfers which may be received several years after the year in which the omitted item of income should have been included in gross income. Thus, for example, if a person seeking relief receives from his spouse an inheritance of property or life insurance proceeds which are traceable to items omitted from gross income by his spouse, that person will be considered to have benefited from those items.
 

 26 C.F.R. § 1.6013-5(b) (emphasis added).