T.C. Memo. 2006-24

UNITED STATES TAX COURT


PHYLLIS E. CAMPBELL, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6772-04.                    Filed February 15, 2006.


Robert E. McKenzie and Kathleen M. Lach, for petitioner.

Kathleen C. Schlenzig, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:  Petitioner challenges respondent's determination that she is not entitled to relief from joint and several liability under section 6015(b) or, in the alternative, under section 6015(f) for the taxable year 1983.[1]  Petitioner

_____

[1]Unless otherwise indicated, all section references are to
                                              (continued...)

seeks relief from respondent's determination of a joint and several tax liability (including interest) of $2,884,120.91. As explained herein, we find petitioner is entitled to relief under section 6015(b).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact are incorporated herein by this reference. Petitioner resided in Lampe, Missouri, at the time her petition was filed. Petitioner has been married to Ronald Campbell (Mr. Campbell) since 1968. Petitioner has an undergraduate degree in sociology and a master's degree in special education. In addition, petitioner obtained a licensed practical nurse (LPN) certification in 1994. During the year at issue, petitioner was primarily a homemaker. At the present time, petitioner is employed at Skaggs Community Hospital as an LPN.

Petitioner's Relationship With Ronald Campbell

Petitioner did not participate in and had little knowledge of Mr. Campbell's business matters. Mr. Campbell was a commodities broker and trader. During their marriage, petitioner paid the household expenses from her personal checking account that Mr. Campbell funded through wire transfers from a

---

[1](...continued)
the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

commodities account in petitioner's name at Refco, Inc. (Refco), a trading clearinghouse. Mr. Campbell stated that he transferred approximately $100,000 to petitioner's account every few months.

Petitioner's Assets and Liabilities

On or about February 1, 1983, the Campbells purchased a home in Naperville, Illinois, for $321,000. On August 16, 1982, Mr. Campbell had transferred $1 million to petitioner's personal account from profits in petitioner's Refco account by securing a check from Refco issued to petitioner for that amount. Petitioner used those funds to purchase the home and several certificates of deposit. The house was not subject to a mortgage loan. Petitioner and Mr. Campbell resided in the Naperville home from February 1 through December 31, 1983. Sometime in 1990, the Campbells sold one of two lots on which the Naperville home was located for approximately $165,000. In 1993, they sold the remaining lot for approximately $393,000. In 1990, the Campbells purchased a home in petitioner's name in Lampe, Missouri (the Lampe home), for approximately $181,000. The Lampe home has remained an asset exclusively owned by petitioner. They used some of the proceeds from the sale of the Naperville property to purchase the Lampe home.

As of the end of the taxable year 2000, petitioner had an individual retirement account with a fair market value of $35,833. As of August 14, 2003, there has been no mortgage or

other encumbrance on the Lampe home.  As of March 3, 2005, the Lampe home had an approximate fair market value of $183,000. Petitioner had a balance of approximately $25,000 in her retirement account at Skaggs Community Hospital as of the date of trial.  In addition, petitioner owned a 1993 Ford Explorer at the time of trial.  Petitioner had no other assets of significant value.

Petitioner's Account at Refco

The commodities trading account in petitioner's name with Refco was opened in 1979 under her Social Security number by Mr. Campbell.  Mr. Campbell directed the trading activity in this account.  During the taxable year 1983, petitioner had a net gain of $3,505,382 from trades in her Refco account.  Petitioner did not have knowledge of this gain.  The account statements showing the gains and losses in petitioner's account were addressed to petitioner and mailed to her home address; however, petitioner asserts that she did not open them.  Petitioner stated that she handed over the unopened statements to Mr. Campbell.  Petitioner maintained one or more commodity trading accounts with Refco until at least December 31, 1989.

Petitioner never had any control over the funds in her Refco account.  An examination of her statements from Refco reveals a fluctuating balance, evidencing a constant inflow and withdrawal of funds.  The only access petitioner had to her account was

indirectly through the allowance that Mr. Campbell would deposit in her bank account in order for her to be able to write the family checks. Even when petitioner bought the Naperville home in 1982, she did so with money that Mr. Campbell gave to her from the profits in her account, rather than withdrawing the funds herself. Petitioner had no knowledge of the trading activities, nor was she aware of the balance in the account at any given time.

## Mr. Campbell's Trading Activities

Mr. Campbell directed trading activities for his own account and the accounts of others, including one or more accounts owned by petitioner. During the taxable year 1983, Mr. Campbell held a 5-percent partnership interest in Refco Foods, Ltd., a business that bought, resold, and hedged meat products. Refco Foods, Ltd., is a distinct entity from Refco, which as previously discussed is a trading clearinghouse in which Mr. Campbell has no ownership interest. At the end of the taxable year 1983, Refco Foods, Ltd., had a loss of approximately $2.6 million in its futures spread income account.

During the same year, Mr. Campbell operated a business called Refco Foods Too, a meat commodities trading company, as a sole proprietorship. Refco Foods Too had net losses of approximately $600,000 for the taxable year 1983. In addition, during the taxable year 1983, Mr. Campbell was the president and

sole shareholder of Campco, Inc., a C corporation. Campco, Inc., reported taxable income of $16,005 in its Federal income tax return for the fiscal year ending August 31, 1983.

### London Metal Exchange Transaction

Sometime in late 1983, Mr. Campbell had discussions with Tom Meyers, the CFO of Refco Foods, Ltd., with respect to what has been described as a London straddle (London straddle). The London straddle was conducted through Van Lessen Richardson & Co. (Van Lessen), a brokerage firm controlled by David Lamb, who was one of the individuals organizing the London straddle. Mr. Campbell stated that he funded the London straddle by transferring approximately $2.6 million from petitioner's Refco trading account to the Van Lessen account in 1983. Mr. Campbell explained in his testimony that he took roughly $2.6 million from the trading account in his wife's name at Refco as part of the scheme to generate offsetting losses and he subsequently used those funds to satisfy the losses in Refco Foods Too and Refco Foods, Ltd. Petitioner was not aware that Mr. Campbell withdrew the $2.6 million. Nor did Mr. Campbell consult her about making the withdrawal. The funds were never returned to the account in petitioner's name and never benefited petitioner.

The purported losses generated by the transactions on the London straddle were fictitious. During preparation of the Campbells' 1983 joint income tax return, Jack Esses, a tax return

preparer with the firm of Marcus, Esses, & Associates, Ltd., informed Mr. Campbell that the $2,591,028 loss from the London straddle would not be allowed by the Internal Revenue Service (IRS). Nevertheless, Mr. Campbell instructed that the loss be included in the 1983 joint Federal income tax return. Mr. Campbell did not inform petitioner about Mr. Esses's warning. Mr. Campbell also never told petitioner about the London straddle, nor that he made any kind of investment with the money from her Refco account.

After the London straddle in 1983, Mr. Campbell was not able to make any money on the commodities market. Mr. Campbell explained in his testimony that the market substantially changed, and he was unable to make any money from trading. After 1983, the Campbells moved to a rural area of Missouri. Mr. Campbell's financial situation did not substantially improve until recently.

1983 Tax Return

The Campbells filed a joint income tax return for the 1983 taxable year. Mr. Esses prepared that return. The Campbells reported adjusted gross income of $48,865 and a negative taxable income of $57,956. Further, the Campbells reported an overpayment of $314,229. As a result of the London straddle, petitioner and Mr. Campbell reported a net loss of $2,591,028 from the Van Lessen account on Schedule D, Capital Gains and Losses; Form 6781, Gains and Losses from Regulated Futures

Contracts and Straddle Positions; and Statement 6, Regulated Futures Contract Marked to Market, which were all attached to the 1983 joint Federal income tax return.

Petitioner signed the 1983 joint income tax return. Petitioner did not review the 1983 income tax return before signing it. Further, petitioner did not have any discussions with, or make any inquiries of, Mr. Campbell or Mr. Esses about the 1983 tax return before or at the time of signing it.

Audit of 1983 Return

In 1986, the Campbells' joint Federal 1983 joint tax return was chosen for audit. The audit of the 1983 joint tax return was the result of a criminal complaint filed by the U.S. District Attorney for the Central District of California against the individuals who organized the London straddle. The complaint alleged that the six individuals prearranged commodity transactions using the Van Lessen brokerage firm. The Federal Bureau of Investigation uncovered evidence of a prearranged commodity transaction by Mr. Campbell that resulted in a loss of $2,684,000 and a corresponding gain of $2,645,000 for Refco Foods, Ltd. The $2.684 million loss generated the net loss of $2,591,028 from the Van Lessen account claimed on the 1983 income tax return.

Appeals Process

The Campbells received a proposed notice of deficiency (30-day letter) dated March 5, 1990, proposing a deficiency in income tax for the taxable year 1983 of $2,371,975 and additions to tax aggregating $1,886,986. The Campbells timely protested this proposed deficiency, and the case was sent to the Appeals Office. On September 25, 1998, the Campbells executed Form 870-AD, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, for the 1983 tax year (the 1983 settlement). In the 1983 settlement, the Campbells consented to the assessment and collection of a $598,826 deficiency (not including interest). Further, the Campbells conceded that $435,401 of the deficiency resulted from a tax-motivated transaction. On December 29, 1998, the Campbells received a notice of assessment of $2,804,014.43. Under the Form 870-AD, petitioner was entitled to file a claim for innocent spouse relief under section 6015. In May 2002, Mr. Campbell submitted an offer-in-compromise with respect to the 1983 tax liability of $100,000, which respondent eventually accepted on the grounds of doubt as to collectibility. The Campbells paid the $100,000 by stripping their retirement accounts and borrowing money from petitioner's mother.

On or around April 14, 1999, petitioner submitted a Form 8857, Request for Innocent Spouse Relief (And Separation of

Liability and Equitable Relief), requesting relief pursuant to section 6015(b), (c), or (f) for the taxable year 1983. On August 9, 2000, respondent sent petitioner an initial letter (Letter 3277) notifying her that she was not entitled to relief under section 6015(b) for the taxable year 1983. On September 22, 2000, petitioner sent a protest letter to respondent in response to respondent's notification letter outlining the reasons that petitioner believed respondent's determination was incorrect.

Petitioner submitted a Form 433-A, Collection Information Statement for Wage-Earners and Self-Employed Individuals, to respondent on September 12, 2003. In petitioner's Form 433-A, she reported assets totaling $197,155 (including the Lampe home valued at $183,000). Petitioner had no outstanding liabilities and also reported gross monthly earnings of $2,061 and living expenses of $1,674. Mr. Campbell also reported his assets and liabilities in the Form 433-A.

Final Notice of Determination

On January 23, 2004, the Appeals Office sent to petitioner a Notice of Determination Concerning Your Request for Relief From Joint and Several Liability Under Section 6015 (notice of determination) denying petitioner's request for relief from joint and several liability. The notice of determination denied relief only under section 6015(f) and did not mention section 6015(b).

However, the report by the Appeals officer accompanying the notice of determination denied petitioner relief under section 6015(b) because (1) petitioner had actual or constructive knowledge of all or part of the understatement, and (2) the Appeals officer determined that it was not inequitable to hold petitioner liable for the deficiency. The notice of determination stated that petitioner was not entitled to relief from joint and several liability for the taxable year 1983 under section 6015(f). In making this determination, the Appeals officer evaluated petitioner's request under Rev. Proc. 2003-61, 2003-2 C.B. 296.[2]

On April 22, 2004, petitioner timely filed a petition with this Court under section 6015(e) seeking review of respondent's determination.

---

[2]Rev. Proc. 2003-61, 2003-2 C.B. 296, is effective only for requests for relief filed on or after Nov. 1, 2003, or requests for relief pending on Nov. 1, 2003, for which no preliminary determination letter had been issued as of Nov. 1, 2003. The request for relief in this case was filed on Apr. 14, 1999, and a preliminary determination letter denying petitioner relief was issued on Aug. 9, 2000. Therefore, Rev. Proc. 2000-15, 2000-1 C.B. 447, should have been used to consider this case. There is no basis to conclude, however, that the Appeals officer would have reached a different conclusion under Rev. Proc. 2000-15, supra.

OPINION

Generally, married taxpayers may elect to file a joint Federal income tax return. Sec. 6013(a). Section 6013(d)(3) provides that taxpayers filing a joint return are jointly and severally liable for all taxes due. However, under certain circumstances, section 6015 provides relief to taxpayers seeking to be relieved from joint and several liability. Section 6015 offers three types of relief: (1) Full or partial relief under section 6015(b); (2) proportionate relief under section 6015(c); and (3) equitable relief under section 6015(f). Petitioner seeks relief from joint and several liability under section 6015(b), or in the alternative, section 6015(f). We have jurisdiction to determine whether equitable relief is available to petitioner for the deficiency in tax shown on her joint return. See Ewing v. Commissioner, 118 T.C. 494, 502 (2002).

The taxpayer who files a petition under section 6015(e) generally bears the burden of proof with certain exceptions not applicable in this case. Rule 142(a); Alt v. Commissioner, 119 T.C. 306, 311 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004); Jonson v. Commissioner, 118 T.C. 106, 113 (2002), affd. 353 F.3d 1181 (10th Cir. 2003); Baumann v. Commissioner, T.C. Memo. 2005-31. However, the burden of proof issue does not influence the outcome of this case because our decision is based on the preponderance of the evidence. See Blodgett v. Commissioner, 394

F.3d 1030, 1035 (8th Cir. 2005), affg. T.C. Memo. 2003-212.

Petitioner's Claim for Innocent Spouse Relief:  Section 6015(b)

Although the final notice of determination did not specifically mention section 6015(b), we believe that it was respondent's intent, as reflected in the report of the Appeals officer accompanying the notice, to deny relief under section 6015(b) as well as section 6015(f).  See Aranda v. Commissioner, 432 F.3d 1140, 1144 (10th Cir. 2005) ("We are not concerned with legalities, but with intent."), affg. T.C. Memo. 2003-306.  We believe that the omission in the final notice of determination was a result of careless drafting.  Therefore, we review respondent's determination under section 6015(b) and (f).[3]  To qualify for relief from joint and several liability under section 6015(b), a taxpayer must establish:

> (A) a joint return has been made for a taxable year;
>
> (B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;
>
> (C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

---

[3]Petitioner does not argue that she suffered any prejudice as a result of this omission.  The petition seeks this Court's review under sec. 6015(b) and (f), and respondent does not contest such review.  However, since we have decided petitioner is entitled to relief under sec. 6015(b), it is unnecessary for us to analyze whether petitioner is entitled to relief under sec. 6015(f).

(D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E) the other individual elects * * * the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election * * *.

Because these requirements are stated in the conjunctive, a requesting spouse must satisfy each requirement to qualify for relief from joint and several liability under section 6015(b). Alt v. Commissioner, supra at 313. Respondent concedes that petitioner meets the three requirements of subparagraphs (A), (B), and (E). Thus, we shall address only the application of section 6015(b)(1)(C) and (D).

1. Section 6015(b)(1)(C): Know or Reason To Know

A spouse seeking relief under section 6015(b) must not have known or had reason to know at the time of signing a joint return that there was an understatement of tax on the return. Sec. 6015(b)(1). The general rule in an omission of income case is that the relief-seeking spouse knew or had reason to know of an understatement of tax if she knew of the transaction that gave rise to the understatement. Erdahl v. Commissioner, 930 F.2d 585, 589 (8th Cir. 1991), revg. T.C. Memo. 1990-101; Jonson v. Commissioner, supra at 115. However, in deduction cases, the Court of Appeals for the Eighth Circuit has adopted a different

standard, following <u>Price v. Commissioner</u>, 887 F.2d 959 (9th Cir. 1989).  <u>Erdahl v. Commissioner</u>, <u>supra</u> at 589.

Under this standard, the Court inquires whether a spouse has reason to know if "'a reasonably prudent taxpayer under the circumstances of the spouse at the time of signing the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted.'"  <u>Id.</u> at 590 (quoting <u>Stevens v. Commissioner</u>, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63).  The more the relief-seeking spouse knows about a transaction, "'the more likely it is that she will know or have reason to know that the deduction arising from that transaction may not be valid.'"  <u>Id.</u> at 590 n.6 (quoting <u>Price v. Commissioner</u>, <u>supra</u> at 963 n.9).  The duty to inquire may arise when the relief-seeking spouse has notice that a particular deduction could result in a substantial understatement.  <u>Id.</u>  The failure to inquire "'may result in constructive knowledge of the understatement'".  <u>Id.</u> at 590 (quoting <u>Price v. Commissioner</u>, <u>supra</u> at 965).  The factors considered in deciding whether the relief-seeking spouse had a reason to know or a duty to inquire include:  "'the spouse's level of education, [her] involvement in family financial affairs, the evasiveness or deceit of the culpable spouse, and any unusual or lavish expenditures inconsistent with the family's ordinary standard of living.'"  <u>Id.</u> at 591 (quoting <u>Guth v.</u>

Commissioner, 897 F.2d 441, 444 (9th Cir. 1990), affg. T.C. Memo. 1987-522).

In applying these factors, we note that petitioner's education did not reflect a substantial background in tax or financial matters. Petitioner's role in the family finances was largely limited to paying the family expenses. Petitioner received money to pay those expenses from Mr. Campbell, who deposited "$100,000 or so" from his trading profits every few months.

Even though petitioner was the technical owner of the Refco account that generated large profits in 1983, we find that she was only a nominee and had no control over the funds in the account. Petitioner's only access to the account was from the allowance she received from Mr. Campbell that he deposited in her personal bank account. Petitioner stated that she never asked him to deposit any money. Petitioner was aware that she received a check issued to her in the amount of $1 million in 1982. Part of the $1 million was used to purchase the family home in Naperville, Illinois. However, Mr. Campbell explained in his testimony that he took the money out of petitioner's account to buy the home. Petitioner had no involvement in Mr. Campbell's trading activities or in particular the London straddle. Mr.

Campbell never discussed the details of his trading activities with petitioner.

Further, the totality of the circumstances indicates that Mr. Campbell was evasive about the family finances. Although the financial statements from petitioner's Refco account were mailed directly to her home address, Mr. Campbell had complete control over the cashflow into and out of her account. He treated the funds in petitioner's Refco account as available for use in offsetting losses in his other trading activities. Mr. Campbell did not consult her when he withdrew $2.6 million from her Refco account to invest in the London straddle. In addition, Mr. Campbell failed to inform petitioner that their accountant warned him that the loss resulting from the London straddle would be disallowed. We find that Mr. Campbell's act of depriving petitioner of the benefit of the money earned in her account and using it to finance a tax-motivated transaction without informing her amounts to evasive conduct.

We next address the issue of whether there is evidence of any substantial unexplained improvement in the family's standard of living. Petitioner did not benefit from the underreported income. The money invested into the London straddle from petitioner's account was never returned to her. There is evidence that the Campbells' lifestyle began to deteriorate in 1983, and it continued to do so over the next decade. Because of

Mr. Campbell's subsequent difficulties in the futures market, the Campbells were compelled to move from an affluent area of the Chicago suburbs to a rural area in Missouri, substantially downgrading their standard of living. Petitioner was forced to strip her retirement account and borrow money from her mother to pay for her husband's $100,000 settlement with the IRS. All of these factors point to the conclusion that the Campbells' standard of living deteriorated, rather than improved, after the London straddle.

Taking all the facts and circumstances into consideration, we hold that petitioner did not have actual knowledge of the London straddle. Given this holding, we must decide whether a reasonably prudent taxpayer in petitioner's circumstances had reason to know that the deduction was false or a duty to inquire about the deduction on the return.

We conclude that petitioner did not have reason to know about the false deduction. Petitioner has established that she had no knowledge of the underlying transaction that gave rise to the deficiency. She was not involved in Mr. Campbell's business affairs, she did not know about the London straddle, and she did not know that Mr. Campbell financed the London straddle with money taken from her account. We believe that petitioner's

status as a nominee with no control over the funds in the account dissociates her from the London straddle.

As stated previously, petitioner did not derive a significant benefit from the gains in her account.  Most of petitioner's $3.5 million gain in 1983 was used by Mr. Campbell to offset the losses he sustained in Refco Foods Too.  The money invested in the London straddle was never returned to petitioner.  As a result of the London straddle transactions, petitioner lost access to $2.6 million in her Refco account, and there is no evidence that petitioner benefited from the $314,000 tax refund the Campbells received from their 1983 taxes.

Further, the London straddle was a series of sophisticated transactions that looked legitimate on paper.  A reasonable person with petitioner's educational background, devoid of any specific knowledge in options trading, could not be expected to discover that the trades were fictitious.  It took a complex Federal investigation to figure out that the trades were not legitimate.  As the Court of Appeals for the Second Circuit commented when it considered the status of a spouse whose husband invested in a transaction designed as an income tax shelter: "'[courts] recognize that in the bewildering world of tax shelter deductions, few experts, let alone laypersons, easily discern the difference between a fraudulent scheme and an exceptionally advantageous legal loophole in the tax code.'"  Resser v.

Commissioner, 74 F.3d 1528, 1537 (7th Cir. 1996) (quoting

Friedman v. Commissioner, 53 F.3d 523, 525 (2d Cir. 1995), affg.

in part and revg. in part T.C. Memo. 1993-549), revg. and

remanding T.C. Memo. 1994-241.  Therefore, petitioner had no

reason to suspect that the losses associated with the London

straddle were fictitious.

Respondent argues that petitioner had a duty to inquire.

First, respondent implies that the large deduction on the return

should have caused petitioner to inquire as to the source of the

deduction.  Citing Hayman v. Commissioner, 992 F.2d 1256, 1262

(2d Cir. 1993), affg. T.C. Memo. 1992-228, respondent asserts

that "it is well established that a spouse cannot be relieved of

liability by turning a blind eye to dramatically large deductions

fully disclosed on the returns which would put the spouse on

notice that further inquiry would be needed."

In the Court of Appeals for the Eighth Circuit, the court to

which this case is appealable, the presence of large deductions,

standing alone, is not sufficient to trigger a duty of inquiry;

it is a factor that may be considered in the totality of the

circumstances.[4]  See Erdahl v. Commissioner, 930 F.2d at 591.

Therefore, we may not impose a duty to inquire based solely on

---

[4]We are bound by the Court of Appeals for the Eighth
Circuit's view because of the Golsen rule.  See Golsen v.
Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir.
1971).

the large deductions contained in the return.  The return was prepared by a professional C.P.A., and petitioner had no reason to question its correctness.  See Price v. Commissioner, 887 F.2d at 963; Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-310; Padgett v. Commissioner, T.C. Memo. 1987-130 (noting the complexity of the tax information and concluding that neither the spouse nor "any reasonable person under her circumstances" could have analyzed the transactions without "a sophistication in tax return preparation which she did not have * * * and should not be expected to have").  Further, petitioner has no background in options trading.  Even if she had reviewed the return, a large trading loss would not have raised a red flag because the nature of her husband's option trading business was to lose and gain millions of dollars at a time.

Respondent argues that petitioner had a duty to inquire because the Campbells paid no tax for 1983 and received a refund of $314,229.  We disagree.  Because of the complexity of the transactions at issue and the fact that Mr. Campbell took petitioner's money without her knowledge, we would not expect her to realize that Mr. Campbell was taking aggressive tax losses against the gains in her account.  See Resser v. Commissioner, supra at 1538 (noting that "traders in highly volatile instruments [could] expect to have large realized gains or losses

from year to year, and thus experience some years with large taxes or others with no tax").

Accordingly, we hold that petitioner did not have reason to know that the London straddle deduction was illegitimate, nor did she have a duty to inquire into the presence of the deduction on the 1983 income tax return.

2.  Section 6015(b)(1)(D):  Inequity

We take into account all the facts and circumstances in deciding whether it is inequitable to hold the relief-seeking spouse liable for a deficiency.  Sec. 6015(b)(1)(D).  Because this requirement is similar to the requirement of former section 6013(e)(1)(D), cases interpreting that former section such as Erdahl v. Commissioner, 930 F.2d 585 (8th Cir. 1991), remain instructive to our analysis.  Butler v. Commissioner, 114 T.C. 276, 283 (2000).  The material factors most often cited and considered are whether there has been a significant benefit to the spouse claiming relief and whether the failure to report the correct tax liability on the joint tax return results from concealment, overreaching, or any other wrongdoing on the part of the other spouse.  Alt v. Commissioner, 119 T.C. at 314; Jonson v. Commissioner, 118 T.C. at 119.  Normal support is not considered a significant benefit.  Jonson v. Commissioner, supra at 114.

We have already stated why we believe petitioner did not benefit from the London straddle. She lost access to $2.6 million in her account, and she never saw that money again. As we have noted, the Campbells' lifestyle significantly declined after 1983, and they were forced to move because of Mr. Campbell's misfortunes in the options trading business.

Further, we believe imposing a tax liability of more than $2.8 million as a result of a disallowed transaction of which petitioner had no actual or constructive knowledge would be extremely inequitable. Despite Mr. Campbell's recent success in his trading, we believe that petitioner would suffer severe economic hardship if she faced such a liability. She is in her sixties with a limited number of working years. She has only a small retirement account, her home, and a 1993 Ford explorer.

Respondent argues that it is not inequitable to hold petitioner solely liable for the deficiency because the $3.5 million sheltered by the London straddle was attributable to her. Respondent further suggests that petitioner misled him during the Appeals process because she did not explicitly tell him that the account generating the gain sheltered by the London straddle deduction belonged to her. We disagree.

We have found that petitioner's involvement in the Refco account was in her capacity as a nominee only. Mr. Campbell stated that his friends at Refco opened the account for her.

Further, petitioner has credibly established that she was not involved in the trading associated with the account, nor did she have control of any of the funds in her account.  We therefore do not find her nominal ownership significant in any aspect of this case.  Perhaps petitioner could have been more forthcoming, but petitioner did not mislead respondent and correctly emphasized that it was Mr. Campbell's trading activities that generated the claimed loss from the London straddle.

Accordingly, we find that it would be inequitable to hold petitioner liable for the deficiency in this case.

Conclusion

Petitioner is entitled to relief under section 6015(b) since the preponderance of the evidence indicates that she satisfied the requirements therein.

To reflect the foregoing,

<u>Decision will be</u>

<u>entered for petitioner</u>.