Gwen ERDAHL, Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 90–1926.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 13, 1991.

Decided April 8, 1991.

Barbara D'Aquila, Minneapolis, Minn., for appellant.

Teresa McLaughlin, Washington, D.C., for appellee.

Before JOHN R. GIBSON, BOWMAN, and BEAM, Circuit Judges.

BOWMAN, Circuit Judge.

Gwen Erdahl appeals the decision of the tax court, *Erdahl v. Commissioner*, T.C. Memo. 1990–101 (Feb. 28, 1990), denying relief to her under the innocent spouse provision of the Internal Revenue Code. 26 U.S.C. § 6013(e) (1988). Relief was denied because the tax court determined that Mrs. Erdahl knew or should have known of the substantial understatement of tax on the joint return she filed with her ex-husband for the 1982 tax year. On appeal Mrs. Erdahl argues that the tax court applied an incorrect legal standard in its determination that she is ineligible for relief

as an innocent spouse. We agree. Accordingly, we reverse and remand.

## I.

In 1962, Gwen and Bruce Erdahl were married in Fargo, North Dakota. She was a high school graduate employed by a wholesale distributor and he was attending college on the GI bill. During the early years of their marriage, Mrs. Erdahl continued to work while her husband completed his undergraduate and medical degrees. In 1970, Mrs. Erdahl quit her job with Kelly Services to remain at home with their adopted infant son. In 1972, after fulfilling his internship and residency requirements, Dr. Erdahl began his practice as a radiologist in Sterling, Colorado. The Erdahls then adopted their second child, a daughter.

Two years later, after an unspecified problem occurred with Dr. Erdahl's practice, the Erdahls sold their home and everything they could not pack in their car and began a three-month search throughout the southwestern region of the United States for another radiology position. They ended up back in Colorado where Dr. Erdahl went into practice with another doctor in South Denver. In 1974, not satisfied with that practice, Dr. Erdahl moved his family to Boulder, where he began work at a clinic. In 1977, Dr. Erdahl filed for a divorce and moved into an apartment next to his girlfriend's apartment. He put the family home up for sale and told Mrs. Erdahl that she and the children should move into HUD housing.

By 1978, the Erdahls had reconciled and moved to Wadena, Minnesota. There Dr. Erdahl established Wadena Radiology, P.A., a professional corporation. Dr. Erdahl had promised Mrs. Erdahl that he would make her an officer in his newly-formed corporation. However, when he learned that the corporation needed only one officer to satisfy legal requirements, he took the position for himself and excluded Mrs. Erdahl from having anything to do with his corporation except to serve as a trustee of its pension plan. Dr. Erdahl was the sole employee of Wadena Radiology. Mrs. Erdahl remained at home caring for their children and managing the household expenses with the $1,500.00 monthly allowance Dr. Erdahl gave her. If Mrs. Erdahl needed additional money to buy a new dress or something of that sort, she had to ask her husband for the extra amount. He did not allow her to have any charge cards. Mrs. Erdahl had a personal checking account to pay the household expenses from her allowance. The Erdahls also had a joint checking account that the doctor used almost exclusively.

In 1981, Dr. Erdahl's accountant, Charles Rowe, informed him about a tax-sheltered investment involving the purchase of an interest in Charleston Park, a Texas limited partnership organized to acquire a luxury condominium complex in Houston. Mr. Rowe provided Dr. Erdahl with the partnership's prospectus and other promotional materials. To finance the investment of $60,000.00 for the partnership interest, Dr. Erdahl decided to borrow funds from his corporation's pension plan. The pension plan had to be amended to permit the loan to be made, and the amendment to the plan required Mrs. Erdahl's signature. Dr. Erdahl testified that he discussed the Charleston Park investment and its tax advantages with Mrs. Erdahl on numerous occasions. When she asked whether the Texas condominiums actually existed, he replied, "Oh, yes. Trust me. Charlie Rowe knows all about this." Joint Appendix at 131. Although Dr. Erdahl testified that he showed her the prospectus specifically calling her attention to the page summarizing the prospective tax benefits for the first six years of the investment, Mrs. Erdahl remembers seeing only a postcard addressed to her husband. On October 1, 1981, Dr. and Mrs. Erdahl signed the amendment allowing his corporation's pension plan to make loans. In November 1981, Dr. Erdahl borrowed $30,000.00 from the plan, deposited that amount into the couple's joint bank account, and made the initial $30,000.00 capital contribution to the partnership by check from the joint account. An additional capital contribution of $10,000.00 was made to the partnership by check in August 1982, after Dr. Erdahl borrowed that amount from the Wadena State Bank and deposited the funds into the joint account.

The final contribution of $20,000.00 was paid to the partnership in November 1982, again by check from the joint account, after Dr. Erdahl borrowed another $30,000.00 from his corporation's pension plan to repay the bank loan and to finance the final investment installment. Mrs. Erdahl believed that the total $60,000.00 investment in the Charleston Park partnership was part of her husband's corporation and that their personal funds were not used to finance the investment.

During 1982, Dr. Erdahl was drinking, gambling, and keeping late hours. Mrs. Erdahl heard rumors that her husband had at least one girlfriend and perhaps two or three. The problems culminated on March 17, 1983, when Dr. Erdahl again left his wife and children and moved into a motel. Shortly afterwards, he moved into the family's unfurnished lake home with his girlfriend. On March 31, 1983, two weeks after he had left his wife, Dr. Erdahl called on Mrs. Erdahl to obtain her signature on their joint income tax return for 1982. Like their 1981 return, the 1982 return had been prepared and signed by their accountant, Charles Rowe. On their 1982 return, the Erdahls reported, *inter alia*, income in the amount of $176,661.00 from Dr. Erdahl's salary and a loss in the amount of $68,211.00 from the Charleston Park partnership, which reduced their joint tax liability by $34,105.00.[1] Dr. Erdahl testified that he went over the reported deductions with Mrs. Erdahl to ensure that none had been omitted. He also testified that, as he had done the previous year, he explained to Mrs. Erdahl that they were entitled to a refund because of the Charleston Park partnership. Both Dr. and Mrs. Erdahl signed the 1982 tax return.

On October 23, 1984, Dr. Erdahl divorced Mrs. Erdahl. His share of the property settlement included the family's principal residence, his radiology corporation, and the Charleston Park partnership interest. Mrs. Erdahl and her children moved into a smaller home. Mrs. Erdahl was awarded maintenance in the amount of $1,500.00 a month from Dr. Erdahl until she reached the age of 60 in 1995.

On February 3, 1988, the Commissioner mailed a joint notice of tax deficiency to Dr. and Mrs. Erdahl informing them that the deduction claimed on their 1982 return relating to the partnership loss was disallowed. The Erdahls conceded that the tax deficiency and additions determined by the Commissioner were correct, but Mrs. Erdahl petitioned the tax court for relief from liability under the innocent spouse provision of the Internal Revenue Code. 26 U.S.C. § 6013(e). She and the IRS stipulated that: 1) the Erdahls had filed a joint return for the 1982 tax year, § 6013(e)(1)(A); and 2) the disallowed partnership loss was a "grossly erroneous item" resulting in "a substantial understatement of tax," § 6013(e)(1)(B). At trial, the remaining issues were whether Mrs. Erdahl knew or had reason to know of the substantial understatement at the time she signed the return, § 6013(e)(1)(C), and whether it would be inequitable to hold her liable for the tax deficiency taking into account all the facts and circumstances, § 6013(e)(1)(D). The tax court decided that Mrs. Erdahl was not entitled to innocent spouse relief because she "knew or had reason to know of the underlying circumstances which gave rise to the disallowed losses." T.C. Memo. 1990–101, slip op. at 4. Because of this determination on the knowledge element, the tax court did not reach the issue of whether it would be inequitable to hold Mrs. Erdahl liable for the deficiency considering the totality of the circumstances.

Mrs. Erdahl urges us to hold that the tax court erred as a matter of law in its interpretation of section 6013(e)(1)(C) and in its failure to decide whether it would be inequitable to hold her liable for the deficiency resulting from the disallowed deduction.

## II.

Congress enacted section 6013(e) to shield an innocent spouse from tax liability

---

1. The Erdahls had claimed a similar deduction of $62,545.00 as a loss from the Charleston Park partnership on their joint tax return for 1981. This deduction was not challenged by the Internal Revenue Service.

resulting from erroneous items reported on a joint return by the other spouse. "[T]he statute was passed as an exception to the normal rule of joint and several liability." *Sanders v. United States*, 509 F.2d 162, 166 (5th Cir.1975). Section 6013(e) is a remedial statute providing a basis for equitable relief from harsh application of the normal rule. A spouse seeking the benefit of the statute has the burden of proving that "in signing the return he or she did not know, and had no reason to know, that there was [a] substantial understatement [attributable to grossly erroneous items]." § 6013(e)(1)(C). The definition of a grossly erroneous item includes "any claim of a deduction ... for which there is no basis in fact or law." § 6013(e)(2)(B).

This is the first opportunity our circuit has had to construe the statutory lack of knowledge requirement in the context of a disallowed deduction case. Other courts that have addressed this issue have arrived at a variety of interpretations.[2] This lack of uniformity may stem from the development of section 6013(e). In its original version, the statute offered relief only in cases involving tax deficiencies resulting from omitted items of income. *See* Act of Jan. 12, 1971, Pub.L. No. 91–679, 84 Stat. 2063 (codified as amended at 26 U.S.C. § 6013(e) (1976)). The provision did not encompass "deductions or credits that were erroneously claimed by the culpable spouse." *Stevens v. Commissioner*, 872 F.2d 1499, 1503 (11th Cir.1989). In 1984, Congress amended the innocent spouse provision to extend relief to cases in which the understatement resulted from an erroneously claimed deduction or credit.[3]

In omission cases, the test of knowledge asks whether a taxpayer knew or should have known of an income-producing transaction that his or her spouse has not reported on the joint return. *Quinn v. Commissioner*, 524 F.2d 617, 626 (7th Cir. 1975). Mere knowledge of the underlying transaction that produced the omitted income is sufficient to deny innocent spouse relief. However, as noted by the Ninth Circuit, application of this test to deduction cases would "for the most part wipe out innocent spouse protection." *Price v. Commissioner*, 887 F.2d 959, 963 n. 9 (9th Cir.1989). As *Price* explains, a taxpayer cannot satisfy the lack of knowledge requirement by claiming that he or she failed to review the joint return before signing it. "Section 6013(e) is designed to protect the innocent, not the intentionally ignorant." *Cohen v. Commissioner*, T.C. Memo. 1987–537 (Oct. 20, 1987). In fulfilling this obligation of at least reading the return, the taxpayer "will be put on notice that *some* transaction allegedly has occurred to give rise to the deduction. As a result, if knowledge of the transaction, operating of itself, were to bar relief, a spouse would be extremely hard-pressed ever to [establish lack of knowledge]." *Price*, 887 F.2d at 963 n. 9. We agree with the Ninth Circuit that the mere knowledge of the transaction that was the basis of the erroneous deduction, without more, does not preclude relief and we therefore adopt the *Price* standard requiring "a spouse seeking relief to establish that she did not know and did not have reason to know that the deduction would give rise to a substantial understatement." 887 F.2d at 963.[4]

---

**2.** *E.g., Stevens v. Commissioner*, 872 F.2d 1499, 1505 (11th Cir.1989) (whether the alleged innocent spouse knew or had reason to know that the returns contained phony deductions); *United States v. Flomenhoft*, No. 86–C–1588, 1987 WL 7598 (N.D.Ill. Mar. 2, 1987), *aff'd*, 843 F.2d 500 (7th Cir.1988) (whether taxpayer had knowledge of the understatement of tax therein); *Bokum v. Commissioner*, 94 T.C. 126 (1990), *appeal docketed*, No. 90–5641 (11th Cir.) (whether the taxpayer had knowledge of the underlying circumstances which gave rise to the adjustment in issue); *Depew v. Commissioner*, T.C. Memo. 1988–48 (Feb. 11, 1988) (whether the spouse did

not know or have reason to know of the transaction giving rise to the understatement).

**3.** Section 424(c) of the Deficit Reduction Act of 1984 provides for retroactive application of the amendments to all open tax years to which the Internal Revenue Code of 1954 applies. H.R. Rep. No. 98–432, 98th Cong., 2d Sess., pt. 2, at 1503, *reprinted in* 1984 U.S.Code Cong. & Admin.News 697, 1144.

**4.** We discern no difference between the test we adopt from the Ninth Circuit and the test articulated by the Eleventh Circuit, the only other circuit that has interpreted the lack of knowl-

■ The standard we adopt asks a question different from the query posed by the tax court: "whether [Mrs. Erdahl] knew or had reason to know of the underlying circumstances which gave rise to the disallowed losses." T.C. Memo. 1990–101, slip op. at 4.[5] The tax court determined that because Mrs. Erdahl had knowledge of the purchase of the interest in the limited partnership, she was not entitled to innocent spouse treatment. We do not agree that mere knowledge of the investment in Charleston Park sufficiently supports the conclusion that Mrs. Erdahl knew or had reason to know the deduction of the partnership loss would give rise to a substantial understatement. Accordingly, we hold that the tax court applied an erroneous standard in its determination that Mrs. Erdahl had knowledge precluding innocent spouse relief. Her knowledge of the fact that the investment in the limited partnership had been made is merely one circumstance to consider, along with all the other circumstances of her case, in determining whether she knew or had reason to know of the suspect nature of the claimed deduction.[6]

■ The standard we adopt for innocent spouse cases asks whether "a reasonably prudent taxpayer under the circumstances of the spouse at the time of signing the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted." *Stevens*, 872 F.2d at 1505 (citing *Sanders*, 509 F.2d at 167). If a spouse is put on notice that a particular deduction may result in a substantial understatement, she has a duty to inquire further.[7] Failure to make such an inquiry "may result in constructive knowledge of the understatement being imputed to her." *Price*, 887 F.2d at 965. Among the factors to be considered

edge requirement in the context of deduction cases, in *Stevens*, 872 F.2d at 1505 ("whether the alleged innocent spouse, in signing the returns, knew or had reason to know that the returns contained phony deductions"). Each considers the putative innocent spouse's awareness that the claimed deduction lacks or may lack validity. We disagree with the government's contention that this awareness amounts to knowledge of the tax consequences—an irrelevant factor in innocent spouse determinations. *Purcell v. Commissioner*, 826 F.2d 470, 472 (6th Cir.1987), *cert. denied*, 485 U.S. 987, 108 S.Ct. 1290, 99 L.Ed.2d 500 (1988) ("the knowledge contemplated by section 6013(e)(1)(C) is not knowledge of the tax consequences of a transaction"). Rather, if the putative innocent spouse is unable to persuade the trier of fact that he or she neither knew nor had reason to know that the deduction was suspect, relief will be denied. This interpretation is consistent with the intent of Congress gleaned from committee reports on the 1984 Amendments: "Relief may be desirable, for example, where one spouse claims a *phony* business deduction in order to avoid paying tax and the other spouse has no reason to know that the deductions are *phony....*" H.R. Rep. No. 98–432 at 1502, *reprinted in* 1984 U.S. Code Cong. & Admin.News at 1143 (emphasis added).

5. The tax court relies on its opinion in *Bokum v. Commissioner*, 94 T.C. 126 (1990), *appeal docketed*, No. 90–5641 (11th Cir.); however, it misquotes the test it applies: "it is clear that, to qualify as an innocent spouse, [the taxpayer] must not have knowledge (nor reason to know) of the underlying *transaction* which gave rise to the adjustment in issue." *Erdahl*, T.C. Memo.

1990–101, slip op. at 4 (quoting *Bokum*, 94 T.C. at 146) (emphasis added). The *Bokum* opinion actually refers to the underlying *circumstances*. These terms are not interchangeable. "The circumstances considered include more than mere knowledge of the underlying transactions. They include the size and significance of the transactions, the magnitude of the transactions vis-a-vis other items on the tax returns, and the participation of the taxpayers in and the benefits the taxpayers received from the transactions." *Bokum*, 94 T.C. at 159 (Swift, J., concurring). Although here the tax court professes to use the circumstances test to determine whether Mrs. Erdahl satisfied the lack of knowledge requirement, it actually applied the more stringent transaction test.

6. "Obviously, the more a spouse knows about a transaction, *ceteris paribus*, the more likely it is that she will know or have reason to know that the deduction arising from that transaction may not be valid." *Price*, 887 F.2d at 963 n. 9.

7. If a spouse has questioned the underlying transaction (or the deductions based on that transaction) previously and has received assurances as to its (or their) legitimacy, she need not repeat her queries at the time she is presented with the return, unless the return arrives with red flags flying, *e.g.*, the omission of the preparer's signature. See *Bokum*, 94 T.C. at 148 ("The failure of the accountant to sign the tax return should have made [the person now seeking innocent spouse protection] wonder about whether the accountant was really standing up for the advice embodied in the return.").

in determining whether the spouse had "reason to know" or a duty to inquire into the legitimacy of the claimed deduction are: "the spouse's level of education, [her] involvement in family financial affairs, the evasiveness or deceit of the culpable spouse, and any unusual or lavish expenditures inconsistent with the family's ordinary standard of living." *Guth v. Commissioner*, 897 F.2d 441, 444 (9th Cir.1990).

 The only findings made by the tax court concerning the state of Mrs. Erdahl's knowledge were that she knew: 1) "that the transaction was intended to achieve handsome tax benefits," and 2) "that significant losses were claimed on the tax return." T.C. Memo. 1990–101, slip op. at 5. These findings, standing alone, are not sufficient to support a conclusion that Mrs. Erdahl knew or had reason to know of the understatement. The tax court, however, held that "[g]iven such knowledge" Mrs. Erdahl had a duty to inquire. T.C. Memo. 1990–101, slip op. at 5. We disagree. The test for determining whether the knowledge of the putative innocent spouse was sufficient to trigger a duty to inquire "is the same subjective test used to determine whether she had reason to know of the understatement: would a reasonably prudent taxpayer *in her position* be led to question the legitimacy of the deduction." *Guth*, 897 F.2d at 445. Nowhere in the opinion of the tax court is there even a hint that the court considered the totality of circumstances relevant to Mrs. Erdahl's position at the time she signed the return. We believe that the tax court imposed a far more stringent standard on Mrs. Erdahl than is required by section 6013(e)(1)(C). Because the tax court applied an erroneous legal standard, the judgment denying Mrs.

Erdahl innocent spouse protection is reversed and the case is remanded to the tax court for further proceedings consistent with this opinion.[8]

---

**8.** Mrs. Erdahl's other argument on appeal—that the tax court erred as a matter of law in failing to decide whether it would be inequitable to hold her liable for the tax deficiency—is without merit. Because section 6013(e) is written in the conjunctive, all of its requirements must be met for the taxpayer to be eligible for innocent spouse relief. Because the tax court decided that Mrs. Erdahl failed to satisfy the lack of knowledge requirement under section 6013(e)(1)(C), it did not reach her section 6013(e)(1)(D) argument relating to the inequity of holding her liable for the deficiency. Although the tax court could have made a determination of the inequity issue for the sake of "completeness," *see Krause v. Commissioner*, T.C. Memo. 1991–13 (Jan. 17, 1991) (spouse did not establish her lack of knowledge, but tax court nevertheless decided that it would be inequitable to hold her liable and then denied her relief), it was not required to do so. The inequity issue of course remains open for determination on remand.