RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0044p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

WINNIE L. GREER,

    *Petitioner-Appellant,*

 *v.*

COMMISSIONER OF INTERNAL REVENUE,

    *Respondent-Appellee.*

No. 09-1420

_____

On Appeal from the United States Tax Court.
No. 24062-06.

Argued: January 20, 2010

Decided and Filed: February 17, 2010

Before: SILER, MOORE, and CLAY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Kenton L. Ball, SLONE & BENTON PSC, Lexington, Kentucky, for Appellant. Kenneth W. Rosenberg, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Kenton L. Ball, SLONE & BENTON PSC, Lexington, Kentucky, for Appellant. Kenneth W. Rosenberg, Jonathan S. Cohen, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

**OPINION**

_____

  KAREN NELSON MOORE, Circuit Judge. Petitioner Winnie L. Greer ("Mrs. Greer") appeals a judgment of the U.S. Tax Court finding her ineligible for relief from joint and several liability for federal income tax deficiencies and additions to tax arising from disallowed investment credits claimed on her 1982 tax return and carryback refunds claimed for the previous three years. Mrs. Greer sought relief based on the tax code's innocent-spouse provision, 26 U.S.C. § 6015(b), and equitable-relief provision, § 6015(f). The Tax

Court denied innocent-spouse relief because Mrs. Greer failed to discharge her duty to inquire into the benefits reflected in her and her husband's joint tax filings. The Tax Court denied equitable relief largely on the same basis. Because we cannot say that the Tax Court clearly erred or abused its discretion, we **AFFIRM**.

## I.  BACKGROUND

The Tax Court set forth the relevant facts, which the parties do not dispute:

> At the time the petition was filed, petitioner resided in Kentucky.
>
> Petitioner graduated from high school in Floyd County, Kentucky, in 1965.  She then attended the University of Kentucky, for 2 years and transferred to Louisiana State University from where she graduated with a bachelor of arts degree in music in 1969.  Petitioner also received a master's degree in music education from Marshall University in 1973.  Petitioner did not pursue studies in economics, finance, or accounting in her formal education.
>
> Petitioner married Daniel C. Greer [("Mr. Greer")] in 1967, and they remain married.  Petitioner and Mr. Greer have two daughters, born in 1974 and in 1977.  Mr. Greer is a licensed chemical engineer and was employed by Ashland Oil Co., Inc., from 1969 through July 1993.
>
> From September 1969 through May 1972 petitioner was employed as a high school music teacher.  After that she pursued graduate studies and raised her daughters.  From 1975 to 1985 she acted as a part-time choir director at the Episcopal church where she and Mr. Greer became members sometime in 1982 and 1983.
>
> In 1979 petitioner began a photography business.  She specialized in wedding and portrait photography.  She opened her first photography studio in late 1979 in the family home.  Improvements were made to the home in 1982, and the structure remained petitioner's photography studio even after petitioner and her family moved their residence in 1986.
>
> Throughout the years of her marriage up to and including the years in issue, petitioner relied upon Mr. Greer to manage their financial affairs. Mr. Greer did not conceal any financial activities from petitioner or mislead her with respect to those activities.  However, he was the primary decisionmaker, and she relied upon him to direct their investments and make decisions regarding their finances and taxes.
>
> In 1979 Mr. Greer and petitioner's father founded G & L Communications, Inc. (G & L), a closely held cable television business that operated in Boyd and Greenup Counties of Kentucky.  G & L was taxed as an S corporation until the sale of its assets in November 1982.  Petitioner and Mr. Greer each owned 61 shares of G & L stock.  Petitioner was not active in G & L's management, nor was she an employee of G & L.  In 1982 petitioner and Mr. Greer each continued to own 61 shares.  They each received a cash distribution of $146,918.02 attributable to their respective

portions of the proceeds of the sale. Thus their combined distribution from G & L was $293,836. Following the sale of G & L's assets in 1982, two identical Forms 1099-DIV, Statement For Receipts of Dividends and Distributions, were issued to petitioner and Mr. Greer, each reflecting a dividend distribution of $35,976, a capital gain distribution of $82,072, and a nontaxable distribution of $28,869 for a total distribution to each of $146,917.

Motivated by the anticipated income tax consequences of the G & L dividends and distributions, Mr. Greer invested in Madison Recycling Associates, Inc. (Madison).[1] The background of this transaction and its consequences are fully described in previous judicial opinions, *Greer v. Commissioner* [(*Greer I*), 93 T.C.M. (CCH) 1216, 2007 WL 1373821 (2007)], *Madison Recycling Associates v. Commissioner*, 295 F.3d 280 (2d Cir. 2002), *affg.* [81 T.C.M. (CCH) 1496, 2001 WL 339433 (2001)], and *Madison Recycling Associates v. Commissioner*, [64 T.C.M. (CCH) 1063, 1992 WL 277821(1992)]. We simply note here that the result of those opinions is that respondent has assessed joint deficiencies in income tax and additions to tax against petitioner and Mr. Greer for the years 1979 through 1982. These deficiencies and additions to tax are the liabilities from which petitioner seeks section 6015 relief. The parties previously agreed that any request by petitioner for relief from joint and several liability under section 6015 would not be determined in the most recent Tax Court litigation reflected in [*Greer I*].

The 1982 joint income tax return for petitioner and Mr. Greer was prepared by John W. Artis, C.P.A. Mr. Artis advised Mr. Greer that because the tax benefits associated with Madison significantly exceeded the dollars invested, the Madison investment was "fairly aggressive." Petitioner was not a party to those discussions and relied totally on Mr. Greer to make the decision to claim the tax benefits associated with Madison. Mr. Greer chose not to seek an opinion from Mr. Artis regarding the merits of the Madison transaction. In [*Greer I*], we found as fact that Mr. Greer expected that Madison would provide tax savings of approximately $1.75 for each dollar invested, and the record in this case is consistent with that finding.

On December 16, 1982, Mr. Greer signed a check for $50,000 payable to Madison and drawn on the joint checking account of petitioner and Mr. Greer to purchase a 5.5-percent limited partnership interest in Madison. This was the only checking account that petitioner and Mr. Greer had at the time. At the time of the Madison investment,

---

[1]Madison was a limited partnership formed to lease equipment for use in recycling scrap polystyrene, a type of plastic, which could then be sold on the open market. *Korchak v. Comm'r*, 92 T.C.M. (CCH) 199, 2006 WL 2506626, at *3 (2006). The partnership's offering memorandum warned that it was a tax shelter. *Greer v. Comm'r* (*Greer I*), 93 T.C.M. (CCH) 1216, 2007 WL 1373821, at *3 (2007).

petitioner knew Mr. Greer was purchasing an interest in Madison, and they briefly discussed the Madison transaction before the investment.

In March 1983 Madison filed a partnership return for the taxable year ended December 31, 1982, which reported a loss of $704,111 and a tax credit basis of $7 million. Petitioner and Mr. Greer filed joint individual income tax returns for the years 1979, 1980, 1981, and 1982. The Madison-related pass-through losses and investment credits reported on the joint returns for 1979, 1980, 1981, and 1982 were as follows:

| Year | Loss | Investment Credit |
|------|------|-------------------|
| 1979 | -0-  | $177.28 |
| 1980 | $9,808 | 7,153.00 |
| 1981 | 3,146 | 4,128.00 |
| 1982 | 38,726 | 51,131.00 |

Of the $51,131 credit reported on the 1982 joint Federal income tax return, the net credit used in 1982 from Madison totaled $33,066 because $22,012 was eliminated in the alternative minimum tax computation, and only an additional $3,947 was allowed as a credit against alternative minimum tax. As a result, credits were available to be carried back to 1979, 1980, and 1981.

The distributions from G & L were reported on the 1982 joint return. Reflecting the listed ownership of 61 shares by each, the dividends and capital gain distributions reflected on the Federal income tax return were divided equally between Mr. Greer and petitioner on two separate Forms 740, Kentucky Individual Income Tax Return, which were filed using the status married filing separately. Petitioner signed both the Federal joint income tax return and her separate Kentucky form 740 for 1982. On February 28, 1983, petitioner and Mr. Greer signed a Form 1045, Application for Tentative Refund, for the years 1979, 1980, and 1981, seeking a refund totaling $39,534 as a result of carrying back to those years the credits from the Madison investment. Subsequently in August 1983 petitioner also signed a declaration relating to the Form 1045, which was requested by the Internal Revenue Service to confirm the execution of the original Form 1045. Petitioner discussed the execution of this declaration with Mr. Greer. In October 1983 three refund checks related to the Form 1045 were deposited into the joint account of petitioner and Mr. Greer. The total deposit resulting from these checks was $39,532. There is no explanation in the record for the discrepancy of $2 between this amount and the amount claimed on the Form 1045. Petitioner did not review the 1982 joint Federal income tax return, nor did she review the Form 1045. Petitioner did not ask Mr. Greer for details about the Madison investment, and she did not ask Mr. Greer or Mr. Artis any questions about the 1982 joint Federal income tax

return or the Form 1045. However, petitioner was aware of the Madison investment.

*Greer v. Comm'r* (*Greer II*), 97 T.C.M. (CCH) 1075, 2009 WL 211433, at *1-3 (2009).

The Internal Revenue Service ("IRS") began auditing Madison in 1984 and issued a notice of Final Partnership Administrative Adjustment ("FPAA") disallowing the partnership's claimed tax benefits in 1987. *Greer v. Comm'r* (*Greer III*), 557 F.3d 688, 689 (6th Cir. 2009).[2] In 1988 Madison's partners challenged the FPAA on statute-of-limitations grounds, beginning what would be a fourteen-year legal battle. In 1992, the Greers filed amended returns for 1979-1981, remitting a check for $189,769 to cover the disallowed benefits plus interest and penalties. The Greers then brought suit in federal district court to recover those funds. The case was dismissed pending the outcome of the Madison litigation, but the court ordered the IRS in the meantime to refund the money, plus interest, which it did.

The Tax Court upheld the FPAA for Madison in 2001, and the Second Circuit affirmed in 2002. *Madison*, 81 T.C.M. (CCH) 1496 (2001), *aff'd*, 295 F.3d 280 (2d Cir. 2002). On September 29, 2003, the IRS issued the Greers a notice of deficiency for $87,627 in tax and $544,125 in interest. The Greers challenged the amount, but both the Tax Court and the Sixth Circuit denied relief. *Greer I*, 93 T.C.M. (CCH) 1216, *aff'd*, *Greer III*, 557 F.3d 688. On September 26, 2005, Mrs. Greer submitted Form 8857, requesting relief from the deficiency as an innocent spouse. On December 22, 2005, the IRS denied her request, finding that she knew of the Madison investment, that the money for the investment was drawn from the Greers' joint bank account, that she signed the Form 1045 requesting refunds, and that she received the benefit of those refunds. An appeals officer then denied her appeal, based on her failure to inquire into the claimed deductions:

> [Mrs. Greer] acknowledges that she was aware of [Mr. Greer's] investment in [Madison] and that she did not inquire about the large

---

[2]*Greer III* concerned the period of time over which a continuing-interest penalty could be assessed against Mr. and Mrs. Greer.

deduction and credits claimed with respect to [Madison]. . . . [T]he [Madison] loss deduction and [investment tax credit ("ITC")/business energy investment credit ("BEIC")] were large enough to put [Mrs. Greer] on notice (even given her limited involvement in the family financial affairs and educational background) that further inquiry was warranted to determine the legitimacy of those tax benefits. This is especially true given that the carryback of the ITC/BEIC from [Madison] to 1979, 1980 and 1981 essentially eliminated the tax the couple previously paid for these years, respectively.

Supplemental Appendix ("S.A.") at 185. The appeals officer also determined that it would not be inequitable to hold Mrs. Greer liable, noting that her claim that the debt would wipe out over half of her net worth did not amount to economic hardship. The appeals officer noted that Mrs. Greer had declined a settlement offer of "fifty percent relief of the deficiency." S.A. at 192.

Mrs. Greer then petitioned for review by the Tax Court. The Tax Court held a trial on January 29, 2008. In addition to the evidence summarized above, the court heard testimony that Mr. Greer never believed that the IRS would disallow his claimed losses, that Mrs. Greer generally felt she should not question Mr. Greer's financial decisions, and that Mrs. Greer probably would support Mr. Greer if she were granted innocent-spouse relief and the IRS collected all of his assets. The documentary record reflected that as of September 30, 2007, Mrs. Greer's assets totaled $2,134,256. As of June 2007, the IRS estimated the accrued liability at $1,456,420.

On January 29, 2009, the Tax Court entered judgment for the IRS, finding that Mrs. Greer did not qualify as an innocent spouse because she "should have at least made further inquiry about the extraordinary tax benefits reflected on the joint return for 1982." *Greer II*, 2009 WL 211433, at *6. The court found that rather than having "no reason to know" of the tax understatement, as required for relief, she "chose not to know." *Id.* The court next considered several factors in determining whether Mrs. Greer merited equitable relief. It found that she had failed to prove that economic hardship would result from full liability, that she had not shown that she had no reason to know of the understatement, that she had not received any unusual financial benefit from the money withheld, and that she had complied with the tax laws following the years in

question.  *Id.* at *7.  Placing special emphasis on her failure to establish that she had no reason to know of the deficiency, the court denied relief.  *Id.*  Mrs. Greer timely filed this appeal.

## II.  ANALYSIS

### A.  Standard of Review

The Tax Court's decision that an individual does not qualify for innocent-spouse relief under § 6015(b) is a factual finding reviewed for clear error.  *Golden v. Comm'r*, 548 F.3d 487, 495 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 1647 (2009).  "[F]actual determinations are not clearly erroneous unless we are left with a definite and firm conviction that a mistake has been made."  *Kearns v. Comm'r*, 979 F.2d 1176, 1178 (6th Cir. 1992).  The Tax Court's decision not to award equitable relief under § 6015(f) is reviewed for abuse of discretion.  *Cheshire v. Comm'r*, 282 F.3d 326, 338 (5th Cir. 2002).  The Tax Court "abuses its discretion when it relies on clearly erroneous findings of fact, . . . improperly applies the law or uses an erroneous legal standard," *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 891 (6th Cir. 2004), or "bases its ruling on . . . a clearly erroneous assessment of the evidence," *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 395 (6th Cir. 2009).

### B.  Section 6015(b):  Innocent-Spouse Relief

Pursuant to 26 U.S.C. § 6013(d)(3), taxpayers filing joint returns are jointly and severally liable for any understatement of tax.  A taxpayer is excepted from this general rule if he or she can establish status as an "innocent spouse" under § 6015.  A taxpayer who is still married, as Mrs. Greer is, bears the burden of establishing each of the following five elements to qualify for the innocent-spouse exception:

(A)     a joint return has been made for a taxable year;

(B)     on such return there is an understatement of tax attributable to erroneous items of one individual filing the joint return;

(C)     the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

(D)     taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E)     the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election.

26 U.S.C. § 6015(b)(1)[3]; *Richardson v. Comm'r*, 509 F.3d 736, 745-46 (6th Cir. 2007). Here, the government agreed that Mrs. Greer meets elements (A) and (E). *See Greer II*, 2009 WL 211433, at *4. Mrs. Greer now makes arguments about element (B), contending under a nominee theory that the understatement is attributable only to Mr. Greer because he was the true owner of the sixty-one shares of G & L whose sale profits the Madison losses offset, and about element (D), noting that she did not benefit from the tax windfall and that liability would cause her economic hardship. The Tax Court, however, did not reach these issues, and they are not properly before us on appeal. The Tax Court denied relief entirely on the basis of element (C), the requirement that the taxpayer "did not know, and had no reason to know," of the deficiency. The parties stipulate that Mrs. Greer had no actual knowledge of the tax deficiency. Pet'r Br. at 27. Thus, the sole issue that we confront in reviewing the denial of innocent-spouse relief here is whether Mrs. Greer established that she had "no reason to know" of the understatement resulting from the Madison losses.

Courts have interpreted the reason-to-know element to encompass two separate types of constructive knowledge. First, a spouse may have reason to know of an understatement reflected on the tax filings. Second, even if a spouse does not have reason to know of an understatement, he or she nonetheless may have reason to know

---

[3] Section 6015(b)(1) was formerly codified in almost identical terms at 26 U.S.C. § 6013(e)(1)(D). Cases interpreting the old provision are therefore relevant. *Alt v. Comm'r*, 101 F. App'x 34, 39 (6th Cir. 2004) (unpublished opinion).

of a *possible* understatement, giving rise to a duty to inquire into that possibility. *Kistner v. Comm'r*, 18 F.3d 1521, 1525 (11th Cir. 1994); *Price v. Comm'r*, 887 F.2d 959, 965 (9th Cir. 1989). As the Ninth Circuit has explained:

> Even if a spouse is not aware of sufficient facts to give her *reason to know* of the substantial understatement, she nevertheless may know enough facts to put her *on notice* that such an understatement exists. Such notice is provided if the spouse knows sufficient facts such that a reasonably prudent taxpayer in her position would be led to question the legitimacy of the deduction. In such a scenario, a duty of inquiry arises, which, if not satisfied by the spouse, may result in constructive knowledge of the understatement being imputed to her.

*Price*, 887 F.2d at 965 (citations omitted). Here, the Tax Court invoked the latter ground, holding that Mrs. Greer knew enough to trigger a duty of inquiry, which she failed to discharge. *Greer II*, 2009 WL 211433, at *6. We therefore review whether the Tax Court clearly erred in determining that Mrs. Greer had a responsibility to inquire about a possible understatement on the Greers' 1982 tax-year filings.

### 1. Applicable Legal Test

As an initial matter, this case presents us the opportunity to decide what test should be used in determining whether a taxpayer had a reason to know of an understatement, or to suspect a possible understatement, resulting from disallowed deductions or credits. The Tax Court previously has stated that in all tax-deficiency cases—that is, in both omitted-income and erroneous-deduction cases—it will find that a taxpayer had reason to know of an understatement if he or she had knowledge of the transaction giving rise to the claimed tax benefits. *See Bokum v. Comm'r*, 94 T.C. 126, 146 (1990), *aff'd on other grounds*, 992 F.2d 1132 (11th Cir. 1993). We have followed this knowledge-of-the-transaction test in omitted-income cases. *See Kosinski v. Comm'r*, 541 F.3d 671, 681 (6th Cir. 2008) (holding that taxpayer was not entitled to innocent-spouse relief when she knew of and played an active role in fraudulent transactions that allowed couple to under-report income); *Richardson*, 509 F.3d at 746 (same, when taxpayer knew of trust-scheme transactions that shielded couple's income from taxation); *Purcell v. Comm'r*, 826 F.2d 470, 473-74 (6th Cir. 1987) (denying relief from

liability for omitted income when taxpayer knew of transaction giving rise to that income, and denying relief from liability for impermissible deductions when taxpayer could not prove that the deductions that her spouse had taken had no basis in law or fact, as required by an older version of the innocent-spouse provision). We have not applied the knowledge-of-the-transaction test to erroneous-deduction cases.

In *Price v. Commissioner*, the Ninth Circuit pointed out that the knowledge-of-the-transaction test is appropriate in omitted-income cases, but not in erroneous-deduction cases:

> We decline to follow the tax court's literal superimposition of the legal standard developed in omission cases onto deduction cases in part because to do so would for the most part wipe out innocent spouse protection in the latter category. Such a standard may be workable in omission cases simply because the understatement is caused by includable income being left off a return. Therefore, it is considerably easier for a spouse to show that she was unaware of the transaction giving rise to the omission, and thus to qualify for relief. But because deductions are necessarily recorded, any spouse who at least reads the joint return will be put on notice that *some* transaction allegedly has occurred to give rise to the deduction. As a result, if knowledge of the transaction, operating of itself, were to bar relief, a spouse would be extremely hard-pressed ever to be able to satisfy the lack of actual and constructive knowledge element of section [6015(b)(1)] in a deduction case.
> Thus, adoption of such an interpretation would do violence to the intent Congress clearly expressed when it expanded coverage of the provision to include relief for spouses from deficiencies caused by deductions for which there is no basis in fact or law. It would also hinder Congress's broader purpose in enacting section [6015(b)]—that of seeking to remedy an injustice—by giving the section an unduly narrow and restrictive reading.

*Price*, 887 F.2d at 963 n.9 (citations omitted). The court went on to hold that in erroneous-deduction cases, "[a] spouse has 'reason to know' of the substantial understatement if a reasonably prudent taxpayer in her position at the time she signed the return could be expected to know that the return contained the substantial understatement." *Id.* at 965. It identified four factors to be considered in making that inquiry: (1) the spouse's education, (2) the spouse's involvement in the family's

financial affairs, (3) the presence of unusual or lavish expenditures beyond the family's norm, and (4) the other spouse's evasiveness or deceitfulness concerning the family's finances. *Id.*

All circuits to have ruled on the *Price* approach have adopted its test for erroneous-deduction cases. *See Hayman v. Comm'r*, 992 F.2d 1256, 1261 (2d Cir. 1993); *Reser v. Comm'r*, 112 F.3d 1258, 1267 (5th Cir. 1997); *Resser v. Comm'r*, 74 F.3d 1528, 1536 (7th Cir. 1996); *Erdahl v. Comm'r*, 930 F.2d 585, 589 (8th Cir. 1991); *Kistner v. Comm'r*, 18 F.3d 1521, 1527 (11th Cir. 1994). One circuit has declined to decide the issue. *See Doyle v. Comm'r*, 94 F. App'x 949, 951-52 (3d Cir. 2004) (unpublished opinion) (holding that the petitioner could not prevail under either the knowledge-of-the-transaction test or the *Price* test). In an unpublished order, a panel of this court applied the *Price* factors in an erroneous-deduction situation, but it did not cite *Price*. *See Streck v. Comm'r*, No. 98-1064, 1999 WL 427381, at \*\*2-3 (6th Cir. June 16, 1999) (unpublished order); *see also Alt*, 101 F. App'x at 41 (citing *Streck* and applying the factors in an omitted-income case). In the instant case, the Tax Court applied *Price*, and the Commissioner has briefed the test's four factors.

Based on the persuasive logic of the Ninth Circuit and on our own case law, we now join our sister circuits in formally adopting the *Price* test for erroneous-deduction cases. The knowledge-of-the-transaction test leaves room for a taxpayer to claim innocent-spouse relief in omitted-income claims, because the understatement arises in such cases from information being left off a return, and the spouse otherwise may not have known or had reason to know that information. In erroneous-deduction cases, the understatement arises from information being *included* on the return, so a spouse who signs a tax return necessarily learns of the transaction.[4] The knowledge-of-the-transaction test writes the innocent-spouse provision out of the law in such cases. A

---

[4] A taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or she is charged with constructive knowledge of its contents. *Park v. Comm'r*, 25 F.3d 1289, 1299 (5th Cir. 1994) (citing *Hayman*, 992 F.2d at 1262); *see also Schneller v. Comm'r*, No. 96-1910, 1997 WL 720388, at \*3 (6th Cir. Nov. 10, 1997) (unpublished opinion) (rejecting taxpayers' argument that penalty for understatement of tax attributable to negligence was improper because they relied on their accountant to prepare their return and did not read it before signing).

more nuanced approach is thus required, especially given that an understatement arising from a deduction usually is not obvious from the face of a tax return. A taxpayer who knows how much money the family earned will know that tax has been understated if income is omitted from the return, as it is common knowledge that income is taxable. *See Price*, 887 F.2d at 963 n.9. By contrast, a taxpayer who is aware of an investment may or may not know that tax benefits claimed on its basis are impermissible, depending on that taxpayer's level of sophistication and how much he or she knows about the investment. *See Reser*, 112 F.3d at 1267 ("[I]n the 1980's, it was common knowledge that investors could legally obtain large tax benefits through clever investment strategies."). The *Price* test takes account of this difference.

The *Price* test also is consistent with our own binding case law. In *Shea v. Commissioner*, 780 F.2d 561 (6th Cir. 1986), we applied a context-specific test under which a taxpayer's reason to know of an understatement depends on "(1) the circumstances which face the [taxpayer]; and (2) whether a reasonable person in the same position would infer that omissions or erroneous deductions had been made." *Id.* at 565-66. In establishing this test, we relied on *Sanders v. United States*, 509 F.2d 162, 167 (5th Cir. 1975), which set out three of the four factors later adopted by the Ninth Circuit in *Price*. *Shea*, 780 F.2d at 565. The *Price* test provides a helpful way of guiding the totality-of-the-circumstances inquiry that we established for innocent-spouse cases years ago in *Shea*.

While the *Price* factors are used to determine whether a spouse had reason to know of an understatement, they may also be employed to determine whether a spouse had a duty of inquiry. *Park*, 25 F.3d at 1293; *Kistner*, 18 F.3d at 1525; *Erdahl*, 930 F.2d at 590-91. In duty-of-inquiry cases, courts have also considered whether the tax returns set forth deductions or credits large enough, relative to the size of the underlying investment or of reported income, to prod a reasonable taxpayer into further investigation. *See Reser*, 112 F.3d at 1267-68, 1269; *Friedman v. Comm'r*, 53 F.3d 523, 531 (2d Cir. 1995); *Park*, 25 F.3d at 1298; *Price*, 887 F.2d at 961.

**2. Application**

The Tax Court held that Mrs. Greer had a duty to inquire into the legitimacy of the tax benefits claimed on the basis of the Madison investment:

> Three of the four *Price* factors would support the conclusion that petitioner should have at least made further inquiry about the extraordinary tax benefits reflected on the joint return for 1982. She knew there was substantial additional income, yet she signed forms reflecting tax refunds generated in the years 1979 through 1981 as a result of the reporting of the 1982 Madison investment. Almost $40,000 in refunds was deposited into the same joint checking account on which the check of $50,000 for the Madison investment was drawn. These refunds were in addition to tax savings of over $33,000 sought through the aggressive reporting of the Madison transaction on the joint return for 1982. Petitioner chose not to know; she was not deceived or misled.

*Greer II*, 2009 WL 211433, at \*6. We review the *Price* factors to determine whether the Tax Court clearly erred in holding that a reasonable person with Mrs. Greer's background and in her circumstances would have known to inquire into the stated tax liability.

(1) *Education*: Mrs. Greer has a master's degree in music education, but she has no specific education in financial affairs. The Tax Court emphasized that she is "an intelligent, well-educated person" and weighed this factor against her. *Greer II*, 2009 WL 211433, at \*6. The cases are clear, however, that it is *financial* education, not education in general, that matters. *See Reser*, 112 F.3d at 1268 (noting that taxpayer with law degree had an education that "albeit advanced, provided her with no special knowledge of complex tax issues"); *Resser*, 74 F.3d at 1537 (holding that education factor favored spouse who had master's degree in medical communications because her training gave her "no special understanding" of finance); *Alt*, 101 F. App'x at 41 (evaluating taxpayer with master's degree in education and noting that "courts have examined the type of education received, specifically, whether the education provided a special knowledge of complex tax issues" (internal quotation marks omitted)); *Korchak*, 2006 WL 2506626, at \*22 (in granting relief, emphasizing that taxpayer with Ph.D. in physiology had no financial training).

(2) *Involvement in Family Finances*:  The Tax Court observed that Mrs. Greer knew of the G & L distributions, signed tax returns and the Form 1045 request for refunds, and shared a joint checking account with Mr. Greer from which the Madison investment was made.  *Greer II*, 2009 WL 211433, at *6.  These facts, however, mainly go to Mrs. Greer's awareness of the Madison transaction.  The facts relevant to her involvement in family finances are her management of her photography business and her collection of that business's records at tax time.  This level of involvement in family finances is comparable to or less than that of taxpayers found to qualify for innocent-spouse relief by other courts, whose cases constitute persuasive precedent.  *See Reser*, 112 F.3d at 1268 (taxpayer worked full time as a lawyer and "was the family's sole source of financial support," but was not significantly involved in finances of husband's professional corporation); *Resser*, 74 F.3d at 1538 (taxpayer served as family check-writer); *Price*, 887 F.2d at 965 (taxpayer paid household expenses and mortgage); *Sanders*, 509 F.2d at 166 (taxpayer balanced husband's checkbooks and typed business letters for him); *cf. Stevens v. Comm'r*, 872 F.2d 1499, 1501, 1507 (11th Cir. 1989) (taxpayer who served as officer and employee of husband's corporations and frequently was present for business discussions was not entitled to relief).  That said, we note that Mrs. Greer was probably familiar enough with basic budgeting and accounting to understand representations made on a tax return, even if the ultimate legitimacy of sheltering income was beyond her experience.

(3) *Lavish or Unusual Expenses*:  While observing that the Greers "lived a very comfortable lifestyle during 1982 and for all the years thereafter," the Tax Court found no "extravagant change in petitioner's lifestyle," the relevant consideration.  *Greer II*, 2009 WL 211433, at *6.  This finding was correct and is not disputed.  *See Resser*, 74 F.3d at 1540 (citing the relative difference from the family's ordinary standard of living); *Kistner*, 18 F.3d at 1525 (same); *Sanders*, 509 F.2d at 168 (same).

(4) *Spouse's Evasiveness or Deceit*:  Mrs. Greer argues that Mr. Greer "took advantage" of her, Pet'r Br. at 43, 55; Reply Br. at 12, but that argument cannot be reconciled with her position that she purposely left him in charge of all financial matters.

The Tax Court correctly found that Mr. Greer was neither deceitful nor evasive regarding the family's finances. The Tax Court weighed this factor against Mrs. Greer, which is consistent with the approach of the courts of appeals. *See, e.g.*, *Friedman*, 53 F.3d at 532 (husband concealed enormous financial losses).[5]

We think the Tax Court's finding that three of the four factors weighed against Mrs. Greer was incorrect. These factors cannot be discussed in an abstract sense or tallied and set against each other as on a ledger. We must ask whether a reasonable person with the background that emerges from our review of the *Price* factors should have raised a question, upon reviewing the tax filings, about the extent of the benefits claimed therein. *See Shea*, 780 F.2d at 565 (quoting Restatement (Second) of Agency § 9, cmt. d (1958) ("A person has reason to know of a fact if he had information from which a person of ordinary intelligence, or of the superior intelligence which such person may have, would infer that the fact in question exists or that there is such a substantial chance of its existence that, if exercising reasonable care with reference to the matter in question, his action would be predicated upon the assumption of its possible existence.")). Here, we must determine whether Mrs. Greer, knowing that she and her husband earned additional income in 1982 from the G & L sale, should have questioned how they nonetheless could claim $33,000 in tax savings for 1982 and $40,000 in carryback refunds for 1979, 1980, and 1981 based on a $50,000 investment.

Having reviewed the record, we cannot say that the Tax Court clearly erred in finding that Mrs. Greer should have inquired into the favorable tax benefits thrown off by the Madison investment. First, the low level of taxes owed relative to the income reported on the 1982 return should have given Mrs. Greer pause. The front page of the 1982 return reflects an adjustable gross income, *after* deducting $38,726 in losses attributable to the Madison investment, of $183,340. S.A. at 38. The second page of the return reflects a total tax liability of $32,742. S.A. at 39. Although the Greers submitted

---

[5]We note, however, that some courts have treated evasiveness as a warning sign of a possible understatement. *See, e.g.*, *Stevens*, 872 F.2d at 1507 ("Mr. Stevens' evasiveness should have prompted Mrs. Stevens to question Mr. Stevens' activities and the validity of the items reported on the tax returns."). If that approach is sound, then a taxpayer's spouse's lack of evasiveness should weigh in the taxpayer's favor.

a check for $10,265 to the IRS (the amount due in excess of the tax withheld), the benefits they claimed resulted in an average tax rate of only 17.86% in a year when their income put them in the highest marginal tax bracket, 50% for income over $85,600. *See* Tax Foundation, U.S. Federal Individual Income Tax Rates History, Income Years 1913-2010, at 8, *available at* http://www.taxfoundation.org/publications/show/151.html. Second, the Form 1045 that the Greers filed, carrying Madison-based credits back to 1979 through 1981 and claiming refunds of $33,000, should have raised a question in Mrs. Greer's mind. In addition to reducing their tax burden in 1982, the Greers were able to zero out their income tax for two of the three preceding years. These reductions are reflected clearly on the first page of the Form 1045, at Line 21 in side-by-side columns labeled "Before carryback" and "After carryback," just above Mrs. Greer's signature. S.A. at 60. Income tax was reduced from $9,654 to $0 for 1979, from $22,161 to $1,363 for 1980, and from $9,082 to $0 for 1981.[6] Over these three years, the couple's adjusted gross income totaled over $220,000. These figures provided the Tax Court adequate grounds for finding that Mrs. Greer, who had sufficient familiarity with financial matters to understand the claimed tax benefits and whose husband neither deceived nor abused her,[7] at least should have inquired into the propriety of the Madison benefits. *See Hayman*, 992 F.2d at 1258-59, 1262 (holding that deductions that reduced tax liability to zero for two years and to near zero for a third year put taxpayer on notice of a possible understatement).

Mrs. Greer contends that a recent Tax Court case, *Korchak v. Commissioner*, 92 T.C.M. (CCH) 199, 2006 WL 2506626 (2006), requires the opposite conclusion. Helen Korchak's husband invested $75,000 in Madison at the same time as Mr. Greer. On their 1982 joint return, the Korchaks claimed $58,000 in losses and $114,000 in credits when their salaries totaled $481,000 and their adjusted gross income totaled $310,000.

---

[6] The figures for total tax liability, which added self-employment taxes to income taxes and which is reflected on Line 27, also reflect these stark reductions: total tax fell from $9,654 to $0 for 1979, from $22,398 to $1,600 for 1980, and from $9,493 to $411 for 1981. S.A. at 60.

[7] *See Kistner*, 18 F.3d at 1526-27 (granting innocent-spouse relief when husband denied wife access to financial records and threatened physical violence if she questioned the tax returns); *Erdahl*, 930 F.2d at 587-88, 591 (granting innocent-spouse relief when husband kept wife on a strict allowance, refused her access to credit cards, cheated on her with other women, and twice left her and their children).

The IRS later issued a notice of deficiency in the amount of $140,000. Mrs. Korchak had a Ph.D. in physiology and worked as a research scientist at a university, but she had no financial coursework, left financial decisions to her husband, and took primary responsibility for raising their three children. She knew that her husband made investments for the family, but she did not know what those investments were, although he was never deceitful or evasive about them. She signed the tax return at her husband's direction without reading it. The Tax Court found that Mrs. Korchak had no reason to know of the Madison understatement and, further, no duty to inquire into a possible understatement. *Id.* at **21-24.

The facts of *Korchak* are remarkably similar to those of the instant case. Nonetheless, the Tax Court here distinguished *Korchak* on three bases: (1) Mrs. Korchak did not even know her husband had made the Madison investment; (2) Mrs. Korchak had no practical business experience; and (3) the Madison benefits did not stand out on the Korchaks' tax return because they sat among other losses and credits. We find the first and third distinctions persuasive. It is clear that Mrs. Greer's knowledge of the Madison transaction was not itself enough to put her on notice of a possible understatement; to hold otherwise would be to revert to the knowledge-of-the-transaction test. However, the fact that her husband informed her of the investment, that the amount of the investment was evident from the check drawn on their joint bank account, and that Madison was the lone entry on Schedule E, Part II[8] and the only investment that could have resulted in the regular and business energy investment credits claimed on Form 3468[9] should have helped Mrs. Greer connect the dots in ways that Mrs. Korchak did not. This was enough, the Tax Court fairly found, to cause a reasonable person in Mrs. Greer's situation to question how a $50,000 investment in Madison could have produced such a low tax rate in the year of the family's highest reported income and simultaneously almost completely wipe out their taxes for the previous three years.

---

[8] "Income or Losses from Partnerships, Estates or Trusts, or Small Business Corporations." S.A. at 47.

[9] "Computation of Investment Credit." S.A. at 52.

The main thrust of Mrs. Greer's argument is that she left financial decisions to Mr. Greer and had no reason to suspect his errors. Several courts, including our own, have held that being a homemaker cannot alone relieve a spouse of joint and several tax liability on a joint return and that one spouse cannot bury his or her head in the sand or turn a blind eye to the other's accounting. *Shea*, 780 F.2d at 566; *Kistner*, 18 F.3d at 1525; *Stevens*, 872 F.2d at 1505-06; *Doyle*, 94 F. App'x at 952. Here, the Tax Court found that Mrs. Greer did just that, failing to question her husband even when the documents she signed should have pushed her to do so. Were this de novo review, we might view the matter differently. For the reasons we have discussed, however, we cannot say that the Tax Court committed clear error in denying innocent-spouse relief based on the reason-to-know element of 26 U.S.C. § 6015(b)(1).

## C. Section 6015(f): Equitable Relief

Mrs. Greer also challenges the Tax Court's denial of discretionary relief under 26 U.S.C. § 6015(f). That section of the tax code provides that if a still-married taxpayer does not meet all the requirements under § 6015(b), the IRS nonetheless has discretion to grant relief from liability if, "taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either)." 26 U.S.C. § 6015(f). IRS regulations provide that the following nonexclusive list of factors should be considered in determining whether to grant § 6015(f) relief: (1) marital status, (2) economic hardship that would result absent relief, (3) knowledge or reason to know of the item giving rise to the deficiency, (4) any legal obligation of the nonrequesting spouse to pay the income tax liability pursuant to a divorce agreement, (5) whether the requesting spouse significantly benefited from the understatement, (6) the requesting spouse's compliance with income tax laws since the years in question, and (7) other factors, such as spousal abuse and poor mental and physical health. Rev. Proc. 2003-61, § 4.03.

Here, the Tax Court found that factors (1), (4), and (7) were inapplicable or neutral. *Greer II*, 2009 WL 211433, at *7. It also found that Mrs. Greer's failure to establish economic hardship and the fact that she had reason to know of a possible

understatement weighed against relief, while the fact that she did not obtain "an unusual financial benefit" from the claimed tax benefits and her consistent compliance with tax laws since 1982 weighed in favor of relief. *Id.* Noting that the applicable factors split two-to-two, the Tax Court then concluded that its finding that Mrs. Greer had reason to know of a possible understatement "pushes the scale against granting relief under section 6015(f)." *Id.* Mrs. Greer now argues that the Tax Court abused its discretion with respect to its findings on economic hardship and reason to know. We have already determined that the Tax Court did not err in concluding that Mrs. Greer had reason to suspect a possible understatement of taxes. Therefore, we will not reverse its ruling unless its conclusion as to economic hardship was based on clearly erroneous factual findings or amounted to a clearly erroneous assessment of the evidence. *Rentz*, 556 F.3d at 395; *Tompkin*, 362 F.3d at 891.

The Tax Court found that Mrs. Greer "has failed to establish that respondent's determination regarding a lack of economic hardship was incorrect." *Greer II*, 2009 WL 211433, at *7. The record evidence supports this conclusion. As of June 30, 2007, the total liability, including accruing penalties and interest, was $1,456,420. S.A. at 19 (Stipulation of Facts at 51). The IRS now estimates the liability at over $1.5 million. Resp't Br. at 61. As of September 30, 2007, Mrs. Greer's assets totaled $2,134,256; of that amount, $869,048 was attributable to an inheritance from her parents, $575,332 to her individual retirement account, and $220,000 to her share of the family home. *See* S.A. at 25, 181. Mrs. Greer estimated the tax liability on her retirement account to be $161,000. Pet'r Br. at 57. Mr. Greer testified at the Tax Court trial that his assets totaled $214,000. *Id.* at 58. Subtracting Mrs. Greer's expected retirement taxes from her assets, the couple as of late 2007/early 2008 had $2,187,256 to satisfy a tax debt now estimated at over $1.5 million. On this accounting, it would seem that Mrs. Greer could still pay "'reasonable basic living expenses'" after satisfying the liability. *Comm'r v. Neal*, 557 F.3d 1262, 1278 (11th Cir. 2009) (quoting Treas. Reg. § 301.6343-1(b)(4) to define economic hardship).

Mrs. Greer makes two responses to this analysis. She first notes that the stock and real estate markets plummeted after the Tax Court trial in 2008. She estimates a thirty-percent decline in the family's assets, putting their net worth at $1,674,000. Pet'r Br. at 58. As the Commissioner points out, however, the thirty-percent figure is a mere estimate; there is no evidence in the record of the actual decline in value of the Greers' holdings. Resp't Br. at 59. Moreover, if this court could reverse an economic-hardship determination based on subsequent fluctuations in the market, "[f]indings of ability to pay . . . always would be subject to reversal based on changes in economic conditions and the vagaries of timing." *Id.* Furthermore, Mrs. Greer could have avoided this market-decline problem had she paid the liability to the IRS years ago and *then* litigated her innocence. *See* Resp't Br. at 61 (citing Rev. Proc. 2005-18). Mrs. Greer responds that she did not know of a tax problem that would affect her until 2003, when the IRS sent her the deficiency notice. We find this unconvincing, however, as Mr. and Mrs. Greer remitted to the IRS $189,769 to cover the alleged liability in 1992 and subsequently filed suit to recover the funds (on a basis other than innocent-spouse relief). *See Greer III*, 557 F.3d at 689. It is not credible that Mrs. Greer could have believed that the dispute concerned her husband only and missed that the disallowance of benefits would affect her, as well.

Mrs. Greer next argues that even if her net worth is large enough to satisfy the outstanding liability, she cannot do so without wiping out her personal retirement account and family inheritance. Pet'r Br. at 58-59. Now 62 years old, she is nearing retirement and had expected to rely on her savings to support her. *See id.* at 60. The Tax Court has taken such situational factors into account in previous cases. *See, e.g.*, *Campbell v. Comm'r*, 91 T.C.M. (CCH) 735, 2006 WL 345827, at *9 (2006) (granting equitable relief to a woman "in her sixties with a limited number of working years" who "ha[d] only a small retirement account, her home, and a 1993 Ford explorer"). We are indeed sympathetic to Mrs. Greer's situation, and again might decide her case differently had we the opportunity to rule in the first instance rather than on deferential review. But we cannot say that the prospect of financial ruin is so plain on the record that the Tax Court abused its discretion in denying equitable relief. We therefore must affirm.

### III. CONCLUSION

This is a close case, and ultimately we are guided by the deferential standard of review applicable to factual findings and discretionary decisions of the Tax Court.  As we can find neither clear error nor abuse of discretion in the Tax Court's rulings, we **AFFIRM** the denial of both innocent-spouse and equitable relief.